## OTIS & CO. *v.* SECURITIES & EXCHANGE COMMISSION ET AL.

No. 81.   Argued November 17, 1944.—Decided January 29, 1945.

---

*Messrs. Arthur G. Logan* and *Robert J. Bulkley* for petitioner.

*Mr. Roger S. Foster,* with whom *Solicitor General Fahy, Messrs. Morton S. Yohalem, David K. Kadane, Theodore L. Thau* and *John W. Christensen* were on the brief, for the Securities & Exchange Commission, and *Mr. Donald R. Richberg,* with whom *Mr. Clarence A. Southerland* was on the brief, for the United Light & Power Co., respondents.

MR. JUSTICE REED delivered the opinion of the Court.

An important although narrow legal point in the interpretation of the Public Utility Holding Company Act of 1935 [1] is involved in this case. This is whether a plan under § 11 (e) of that act may be "fair and equitable" to preferred stockholders within the meaning of those words as used in that section, which allows a participation by junior common stockholders in the distribution of the assets of a registered holding company, which is liquidated in compliance with § 11 (b) (2), before the senior preferred stockholders receive securities whose present value equals the preferred's full liquidation preferences.

---

[1] 49 Stat. 803.

The Securities and Exchange Commission approved the Plan, Holding Company Act Release No. 4215, April 5, 1943. The United States District Court of Delaware approved the Plan, 51 F. Supp. 217, and the Circuit Court of Appeals affirmed this action. This Court has jurisdiction under Judicial Code, § 240 and Section 25 of the Holding Company Act. Certiorari was granted because of the importance of the question raised in administration of the Act. 322 U. S. 724.

The United Light and Power Company, a Maryland corporation, is a registered holding company under the Act. § 5. It is the top holding company of a large system with twenty-four other corporate associates. § 2a (10). Its place in the system violates the prohibition of the Act against a registered holding company being a "holding company with respect to [any] of its subsidiary companies [§ 2a (8)] which itself has a subsidiary company which is a holding company." § 11 (b) (2). This prohibition is known as the "great-grandfather clause."

In proceedings for the simplification of the system, after finding that Power violated the great-grandfather clause, an order was entered on March 20, 1941, directing that Power be liquidated and dissolved.[2] The order authorized Power to submit to the Commission a plan for compliance with the order "on a basis which is fair and equitable to its security holders." Power with its registered holding company subsidiary, the United Light and Railways Company, a Delaware corporation, all of whose common stock was owned by Power, submitted such a plan and after examination by the Commission and modification it was approved by order of April 5, 1943. The Plan was held specifically to be fair and equitable to all security holders. By the application and order Railways' partici-

---

[2] The findings and opinion which led to this order are found in In the Matter of the United Light and Power Company, 8 S. E. C. 837.

pation in the Plan was accepted. Holding Company Act Release No. 4215. This is the order which is before us.

It approved the Plan for the liquidation and dissolution of Power as "necessary to effectuate the provisions of Section 11 (b) of the" Act.[3] It directed counsel for the Commission to apply to an appropriate federal court for an order enforcing the Plan.[4] The central feature of the Plan

---

[3] "It shall be the duty of the Commission, as soon as practicable after January 1, 1938:

.        .        .        .        .

"(2) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such steps as the Commission shall find necessary to ensure that the corporate structure or continued existence of any company in the holding-company system does not unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power among security holders, of such holding-company system. In carrying out the provisions of this paragraph the Commission shall require each registered holding company (and any company in the same holding-company system with such holding company) to take such action as the Commission shall find necessary in order that such holding company shall cease to be a holding company with respect to each of its subsidiary companies which itself has a subsidiary company which is a holding company. . . ." 49 Stat. 820–21, § 11 (b) (2).

[4] "(e) In accordance with such rules and regulations or order as the Commission may deem necessary or appropriate in the public interest or for the protection of investors or consumers, any registered holding company or any subsidiary company of a registered holding company may, at any time after January 1, 1936, submit a plan to the Commission for the divestment of control, securities, or other assets, or for other action by such company or any subsidiary company thereof for the purpose of enabling such company or any subsidiary company thereof to comply with the provisions of subsection (b). If, after notice and opportunity for hearing, the Commission shall find such plan, as submitted or as modified, necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons affected by such plan, the Commission shall make an order approving such plan; and the Commission, at the request of the com-

628

and the one here in issue was Power's proposed distribution of its assets to its preferred and common stockholders. Power's chief asset was its holdings of common stock in its subsidiary, Railways. It represented over $72,000,000 of its total gross assets of a little more than $81,000,000. All other property of Power which remained after the satisfaction of its obligations was to be distributed by Power to Railways. Thus this residual property of Power would inure to the benefit of Railways' new common stockholders, the former stockholders of Power.

Distribution of Power's common stock holdings in Railways was to be effected on the basis of 5 shares of Railways' common stock for one share of Power's preferred and one share of Railways' common for 20 shares of Power's common, an allocation of 94.52% to Power's preferred stockholders and 5.48% to Power's common stockholders. As Railways was the only company in the tier below Power of the holding company system, it would become by the dissolution of Power the top holding company and Power's preferred and common stockholders, by the distribution to them of all of Railways' common, would have in the aggregate the same rights in Railways and in the holding

pany, may apply to a court, in accordance with the provisions of subsection (f) of section 18, to enforce and carry out the terms and provisions of such plan. If, upon any such application, the court, after notice and opportunity for hearing, shall approve such plan as fair and equitable and as appropriate to effectuate the provisions of section 11, the court as a court of equity may, to such extent as it deems necessary for the purpose of carrying out the terms and provisions of such plan, take exclusive jurisdiction and possession of the company or companies and the assets thereof, wherever located; and the court shall have jurisdiction to appoint a trustee, and the court may constitute and appoint the Commission as sole trustee, to hold or administer, under the direction of the court and in accordance with the plan theretofore approved by the court and the Commission, the assets so possessed." 49 Stat. 822, § 11 (e).

company system that Power had. The rights and preferences of Power's stockholders would of course disappear with the distribution of Railways' common and the dissolution of Power. As holders of Railways' single class of common, a new relationship of equality would arise between Power's preferred and common stockholders.

This order was preceded by an examination by the Commission into the situation of this holding company system.[5] For a clear understanding of the single issue as to whether, in the liquidation of a holding company by order of the Commission under § 11 (e), a participation by junior security holders in the assets is permissible before preferred security holders have received the entire liquidating preference secured to them by the company's charter, it is sufficient to state only the following facts about which there is no controversy between the litigants. Power is a solvent company. As of April 30, 1942, and there is no intimation that its condition has worsened, its balance sheet showed assets of $81,159,075 and liabilities of only $6,132,976, without consideration of its capital stock structure. Its principal asset, the Railways common stock heretofore referred to, has a book value in excess of the $72,000,000 plus at which it is carried on Power's balance sheet and an actual value which makes Power unquestionably solvent with large equity values in its stock.

Power has outstanding 600,000 shares of Class A Preferred. This preferred stock has a liquidation value of $100 per share or $60,000,000, plus arrearages of $38,-700,000 as of December 31, 1942, or a total liquidating value ahead of the common, as of the time of the order,

[5] The details are fully covered in 8 S. E. C. 837 and Application 14, Release No. 4215.

of $98,700,000.[6]  There are 2,421,192 shares of Class A common and 1,055,576 shares of Class B common.[7]

The Commission found the balance sheet value of all Railways' common on a pro forma corporate basis to be $77,954,874 and, when using a pro forma consolidated basis for the entire system, to be $81,554,330.  On a capitalization of reasonably anticipated earnings of the system, the Commission was unable to find a value for Railways' common "which approaches $98,700,000.00."[8]

---

[6] Power's charter provides: "Upon the dissolution or liquidation of the corporation, whether voluntary or involuntary, the holders of the Class A Preferred stock shall be entitled to receive out of the net assets of the corporation, whether capital or surplus, for each share of such stock, one hundred dollars and a sum of money equivalent to all cumulative dividends on such share, both accrued and in arrears (whether or not the same shall have been declared or earned), including the full dividend for the then current quarterly period, before any payment is made to the holders of any stock other than the Class A Preferred stock.  Any assets thereafter remaining shall be distributable among holders of stock other than the Class A Preferred stock in accordance with their rights at the time of the distribution."

The amended charter (1929) also contains the following:

"The Common Stock of the Company shall be subject to the rights of the holders of the Class A Preferred stock."

[7] The two classes are entitled to the same rights, except the B has votes.  As there is no dispute before us as to the relative rights or priorities of the common, the two classes will be treated in this opinion as a single class of common.

[8] "In order to show a value of as much as $98,700,000, it would be necessary to capitalize 1942 consolidated net earnings applicable to the common stock of Railways (the highest earnings since 1931) at a rate of 6.9%, a times-earnings ratio of 14.5.  Even if the most liberal estimate of earnings made by the management, in the amount of $7,000,000, be taken as the measure of prospective earning power, capitalization of such earnings at a rate producing a times-earnings ratio of 14.1 is necessary to reach an over-all value of $98,700,000." Release No. 4215, pp. 7–8.

The Commission illustrated the market valuation by times-earnings ratio by pointing out that for nine representative public utility holding companies it had averaged from a high of 12.5 in 1937 to a low of 5.1 in 1942 with 1943 at 7.1.  *Id.*

If the liquidation preference of Power's preferred stock is applicable, under the Commission's conclusions on present valuations all of the Railways' common would go on distribution to Power's preferred. The Commission determined that the liquidation preference was not applicable and for these reasons.

The Commission's order of March 20, 1941, for the liquidation and dissolution of Power was a step in the simplification of the holding company system which simplification was enjoined by § 11 (b) (2) of the Act. Satisfaction of the great-grandfather clause might have been obtained in this or other holding company systems by an order for merger, consolidation or recapitalization between top holding companies or between associate companies in the lower tiers of the corporate hierarchy. Such procedure would avoid the liquidation of Power. Cf. *Windhurst* v. *Central Leather Co.,* 105 N. J. Eq. 621, 149 A. 36; *Porges* v. *Vadsco Sales Corp.,* 32 A. 2d 148, 151. The selection by the Commission of one method of system adjustment to accomplish simplification rather than another is an incident which ought not to affect rights. The exercise of legislative power by Congress through § 11 (b) (2) to accomplish simplification as a matter of public policy and the Commission's administration of the Act by dissolution of this particular company results in a type of liquidation which is entirely distinct from the "liquidation of the corporation, whether voluntary or involuntary" envisaged by the charter provisions of Power for preferences to the senior stock.[9]

This conclusion permitted the Commission to examine the investment values of the common and preferred stocks of Power. The rights of the preferred stock to $6 annual cumulative dividends in the going business[10] and to full priority in liquidation other than by operation of the Act were treated as factors in valuation rather than determi-

[9] Release No. 4215, pp. 9–12.
[10] 8 S. E. C. 842.

native of amounts payable in a traditional dissolution. Upon analysis of the Holding Company System's experience and upon an estimate of future earnings, the Commission assumed earnings of $6,185,000 annually which would be applicable to Railways' common and, as a consequence of the distribution, to Power's preferred and common stockholders. Since the annual preferred dividend requirements were $3,600,000, there appeared a balance of $2,585,000 available for the reduction of preferred stock arrearages of $38,700,000 as of December 31, 1942. The Commission noted that if all the assumed earnings materialized and were applied to liquidating the preferred current and deferred dividends, in approximately fifteen years the arrearages would be paid and the common would be in a position to receive dividends.[11] Furthermore, only by forced liquidation could the common stock be deprived of its possibility for future earnings. Only by means of forced liquidation and the receipt of all Railways' common, could Power's preferred gain a right to prospective earnings above its guaranteed dividends. The deferred dividends do not bear interest. While recognizing that the common stock participation was remote, the Commission determined that in its "over-all judgment" Power's common had a legitimate investment value of a proportion of 5.48 per cent of Power's assets to the preferred's value of 94.52 per cent. Such a conclusion is not "susceptible of mathematical demonstration," [12] any more than any other valuation of a utility's worth. The Commission determined this allocation was fair and equitable within § 11 (e).

Petitioner does not challenge the above allocation of values between the preferred and common stock of Power, if the Commission is correct in treating the stock rights

---

[11] Release No. 4215, p. 18.

[12] *Id.*, p. 19.

as though in a continuing enterprise instead of in liquidation. Petitioner relies upon the charter rights which on liquidation of Power give to the preferred $100 and the cumulated and accrued dividends. Note 6, *supra*. It relies upon the authorities of this and other courts which hold that under a full priority rule junior securities in bankruptcy or equity reorganizations may not participate in the assets until the rights of the holders of senior securities are satisfied in full.[13] Petitioner says:

"When the Plan, whatever the device used, contemplates the surrender of outstanding securities for new securities, either in the same or a different company, it is not 'fair and equitable' to force senior security holders to accept less than that which they are contractually entitled to receive."

To petitioner, no distinction is to be drawn between liquidation under bankruptcy or reorganization and liquidation under the Public Utility Holding Company Act by virtue of §§ 11 (b) (2) and 11 (e).

We reach the conclusion that the Securities and Exchange Commission applied the correct rule of law as to the rights of the stockholders inter sese. That is to say, when the Commission proceeds in the simplification of a holding company system, the rights of stockholders of a solvent company which is ordered by the Commission to distribute its assets among its stockholders may be evaluated on the basis of a going business and not as though a liquidation were taking place.

The manifest solvency of Power simplifies the problem of stockholders' rights with which we are here concerned.

[13] *Northern Pacific R. Co.* v. *Boyd*, 228 U. S. 482; *Case* v. *Los Angeles Lumber Products Co.*, 308 U. S. 106; *Consolidated Rock Products Co.* v. *du Bois*, 312 U. S. 510; *Marine Properties* v. *Manufacturers Trust Co.*, 317 U. S. 78; *Ecker* v. *Western Pacific R. Corp.*, 318 U. S. 448; *Group of Investors* v. *Chicago, M., St. P. & P. R. Co.*, 318 U. S. 523.

The creditors are satisfied.[14] No possibility exists that simplification of structure is employed here to evade or nullify creditors' rights in reorganization or to take the place of traditional reorganization.[15]

Like the bankruptcy and reorganization statutes, the Public Utility Holding Company Act, in providing that plans for simplification be "fair and equitable," incorporates the principle of full priority in the treatment to be accorded various classes of security interests. This right to priority in assets which exists between creditors and stockholders, exists also between various classes of stockholders. When by contract as evidenced by charter provisions one class of stockholders is superior to another in its claim against earnings or assets, that superior position must be recognized by courts or agencies which deal with the earnings or assets of such a company. Fairness and equity require this conclusion. Even before our decision in *Case* v. *Los Angeles Lumber Products Co.* on November 6, 1939, recent federal cases had recognized this priority.[16] That has been their view since the *Case* decision, *In re Porto Rican American Tobacco Co.*, 112 F. 2d 655, 656–57. This is the rule applied by the Com-

---

[14] Creditors' contracts also have been declared subject to equitable adjustment in corporate reorganizations so long as they receive "full compensatory treatment" whether the reorganization is in bankruptcy (*Kansas City Terminal R. Co.* v. *Central Union Trust Co.*, 271 U. S. 445, 455; *Consolidated Rock Products Co.* v. *du Bois*, 312 U. S. 510, 528–30; *Group of Investors* v. *Chicago, M., St. P. & P. R. Co.*, 318 U. S. 523, 565–66) or in compliance with regulatory statutes. *Continental Ins. Co.* v. *United States*, 259 U. S. 156, 170–76. The full priority rule applies to reorganizations of solvent companies. *Consolidated Rock Products Co.* v. *du Bois*, 312 U. S. 510, 527.

[15] See In the Matter of Jacksonville Gas Company, Holding Company Act Release No. 3570, *In re Jacksonville Gas Co.*, 46 F. Supp. 852, 856.

[16] *In re New York Railways Corp.*, 82 F. 2d 739, 743–44; *In re National Food Products Corp.*, 23 F. Supp. 979, 985; *In re Utilities Power & Light Corp.*, 29 F. Supp. 763, 769.

mission in the simplification of corporate structure. The Commission recognizes and applies the doctrine of full priority by giving value to the rights of the preferred in a going concern rather than as if by sale and distribution. Its views are stated below.[17] The issue in this case is not whether full priority should be given to preferred over common stockholders but whether the priority which is established by the charter, note 6, is applicable to a simplification by liquidation under § 11 (b) (2) and (e). There is an argument that if the charter provision applies to this situation, it cannot be disregarded and that in such a liquidation "fair and equitable" would require the dis-

---

[17] "It is pointed out in Commissioner Healy's separate opinion that the words 'fair and equitable' embodied in Section 11 have a settled meaning, as determined by the courts, and that an application of the 'absolute priorities' doctrine must result in no distribution to Power's common stock in this case. But that is because he measures the rights of the preferred stock as they would be measured in bankruptcy cases, and not merely because he follows the 'absolute priorities' doctrine in determining the consequences of the measurement. In other words, we can agree with him when he says that absolute priorities must be respected, because we think that doctrine simply means that the common stock must not be accorded any participation unless the preferred stock has been fully compensated for its rights and priorities. But there the area of agreement stops, because he says further that the rights and priorities of the preferred stockholders are the same here as in bankruptcy cases, where their claims to liquidation preferences (including dividend arrearages) are treated as matured. In our view it would be unconscionable and contrary to the plain intention of Congress to so hold." Holding Company Act Release No. 4215, p. 12.

"Under the circumstances, fair and equitable compensation will be given to all of the claimants if their rights are measured not in terms of the situation created by the statute but rather in terms of the situation terminated by it—i. e., as though no liquidation were to take place. In this way, each class of stock will be accorded its proportionate share of the benefits to be gained from the elimination of a useless and expensive corporate entity and from the receipt of a security representing a more direct investment in the underlying assets and earnings of the system." *Id.*, p. 13.

636

tribution of assets only to the preferred. We do not reach that question. The point at issue is whether this charter provision applies.

The applicability of the charter provision under the Public Utility Holding Company Act of 1935 is a matter of federal law.[18]

When the President sent to Congress the report of the National Power Policy Committee which placed the suggestions of the Executive on holding companies before the legislative body, he said of the pending Public Utility Holding Company bill:

"Such a measure will not destroy legitimate business or wholesome and productive investment. It will not destroy a penny of actual value of those operating properties which holding companies now control and which holding company securities represent insofar as they have any value. On the contrary, it will surround the necessary reorganization of the holding company with safeguards which will in fact protect the investor." S. Rep. No. 621, 74th Cong., 1st Sess., p. 2.

That report urged the same care to investors:

"Simplification and reorganization of holding-company structures, making possible within a reasonable period the practical elimination of the holding company, should be conducted under the Commission's supervision over a period of time to prevent undue losses to security holders from investment dislocations." Id., p. 60.

Of course, Congress would wish, in simplifying a holding company system capital structure, to preserve values to

---

[18] *Jerome* v. *United States*, 318 U. S. 101, 104; *Wragg* v. *Federal Land Bank*, 317 U. S. 325, 328; *Chicago Board of Trade* v. *Johnson*, 264 U. S. 1, 10; *Sola Electric Co.* v. *Jefferson Co.*, 317 U. S. 173, 176; *Labor Board* v. *Hearst Publications*, 322 U. S. 111, 120, 129; *Clearfield Trust Co.* v. *United States*, 318 U. S. 363, 366; *O'Brien* v. *Western Union Telegraph Co.*, 113 F. 2d 539, 541.

investors, not to destroy them.[19]   Consequently, while giving the Commission power to compel the elimination of holding companies deemed uneconomic, it allowed the affected companies to propose plans to the Commission to effectuate the objects and the Commission to approve such plans when they were considered "fair and equitable." §§ 11 (b) (2) and (e), notes 3 and 4.

It may be that if the charter liquidation preference were held to cover this situation it would not frustrate the simplification of the holding company system, to the same degree that the gold clause agreements interfered with the power of Congress to regulate the gold content of the dollar.   *Norman* v. *B. & O. R. Co.,* 294 U. S. 240, 306, *et seq.,* and cases cited.   Distribution to preferred stockholders only with disregard of common's interest would eliminate Power and cure the system's present inconsistency with the great-grandfather clause.   We think, however, the charter preference is inoperative in simplification under § 11 (b) (2).   The provision having been adopted in 1929, six years prior to enactment of the Public Utility Holding Company Act, a "simplification" under this Act, having as an incident to it the dissolution of one company in a holding company system, was not an anticipated "liquidation" within the meaning of Power's charter provision. Enforcement of an overriding public policy should not have its effect visited on one class with a corresponding windfall to another class of security holders.   Nor should common stock values be made to depend on whether the Commission, in enforcing compliance with the Act, resorts to dissolution of a particular company in the holding company system, or resorts instead to the devices of mer-

---

[19] "Such disposition as may be necessary can be accomplished by reorganization which will equitably redistribute securities among existing security holders."   S. Rep. No. 621, 74th Cong., 1st Sess., p. 16; H. Rep. No. 1318, 74th Cong., 1st Sess., pp. 49–50.

ger or consolidation, which would not run afoul of a charter provision formulated years before adoption of the Act in question. The Commission in its enforcement of the policies of the Act should not be hampered in its determination of the proper type of holding company structure by considerations of avoidance of harsh effects on various stock interests which might result from enforcement of charter provisions of doubtful applicability to the procedures undertaken. Where pre-existing contract provisions exist which produce results at variance with a legislative policy which was not foreseeable at the time the contract was made, they cannot be permitted to operate. Compare *New York Trust Co.* v. *Securities & Exchange Commission*, 131 F. 2d 274; *In re Laclede Gas Light Co.*, 57 F. Supp. 997. The reason does not lie in the fact that the business of Power continues in another form. That is true of bankruptcy and equity reorganization. It lies in the fact that Congress did not intend that its exercise of power to simplify should mature rights, created without regard to the possibility of simplification of system structure, which otherwise would only arise by voluntary action of stockholders or, involuntarily, through action of creditors. We must assume that Congress intended to exercise its power with the least possible harm to citizens.

But it is said that such a conclusion is at variance with this Court's ruling in *Continental Insurance Co.* v. *United States,* 259 U. S. 156. In that case a liquidation of the Reading Company, a holder of interests in railroads and coal mines, was compelled by governmental prosecution so that it would not be operating in violation of the Sherman Anti-Trust Act or the Hepburn Act.[20] Its coal properties, corporate assets, were passed to a newly organized

[20] 259 U. S. 156 at 177; *United States* v. *Reading Co.*, 253 U. S. 26; 26 Stat. 209; 34 Stat. 584.

coal company, the value of whose stock, by negotiable certificates of interest, came into possession of Reading's old stockholders individually. The distribution gave equal participation in the coal properties to the common and preferred stock in accordance with the charter agreement as to assets on liquidation, pages 177–181. The common stock contended that as the value of the coal properties was surplus, all of the coal certificates should go to the common stockholders as in a continuing business. Thus, by its approval of the distribution, this Court handled the liquidation, which was forced by law, says petitioner, in accordance with the charter provisions and not as though it were a continuing business.

The *Continental* or *Reading* case turned, however, on the charter rights of the preferred to share equally with the common in earnings which had become assets, pages 179–80, not on whether a right to share was matured or varied by governmental action. Contrary to the situation in this present case, the charter provisions of the Reading Company were adopted with knowledge of the sanctions of the Sherman Act against monopoly. 259 U. S. 177 and 171. We do not feel constrained by its dealing with charter rights as in a normal liquidation to hold that where liquidation is adopted as a matter of administrative routine, the preferences are thereby matured.

As indicated earlier in this opinion, we have not undertaken to review the facts to determine whether the allocation of stock between the preferred and common is in proper proportion. That issue is not made. It was vigorously discussed by Commissioner Healy in the dissenting opinion. Holding Company Act Release 4215, p. 39 *et seq.* See Dodd, Holding Company Act Recapitalizations, 57 Harv. L. Rev. 295, 319. The allocation properly may be made without dollar valuation so long as "each security holder in the order of his priority receives

from that which is available for the satisfaction of his claim the equitable equivalent of the rights surrendered." *Group of Investors* v. *Chicago, M., St. P. & P. R. Co.*, 318 U. S. 523, 565; *Consolidated Rock Products Co.* v. *du Bois*, 312 U. S. 510, 529–30; *Ecker* v. *Western Pacific R. Corp.*, 318 U. S. 448, 482; *Kansas City Terminal R. Co.* v. *Central Union Trust Co.*, 271 U. S. 445, 455.

As the parties have not challenged them, we have not considered in any way the constitutionality of the sections of the Holding Company Act involved.

*Affirmed.*

Mr. Justice Douglas took no part in the consideration or decision of this case.

Mr. Chief Justice Stone, dissenting.

Mr. Justice Roberts, Mr. Justice Frankfurter and I think the judgment below should be reversed.

The United Light and Power Company, the subject of this litigation, is a holding company subject to provisions of the Public Utility Holding Company Act of August 26, 1935, 49 Stat. 803. It has $60,000,000 par value of Class A preferred stock, of which petitioner holds some shares, and two classes of common stock. The corporate charter provides:
"Upon the dissolution or liquidation of the corporation, whether voluntary or involuntary, the holders of the Class A Preferred stock shall be entitled to receive out of the net assets of the corporation, whether capital or surplus, for each share of such stock, one hundred dollars and a sum of money equivalent to all cumulative dividends on such share, both accrued and in arrears (whether or not the same shall have been declared or earned), including the full dividend for the then current quarterly period, before any payment is made to the holders of any stock other than the Class A Preferred stock."

The dividends on the preferred stock accrued and unpaid amount to $64.50 per share, and the total priority of the preferred stock as provided by the corporate charter is $98,700,000.

Sections 1 (c) and 11 (a) and (b) (2) of the Act authorize the Commission, after an examination of their corporate structures, "to compel the simplification of public-utility holding-company systems" and to require any such holding company "to take such action as the Commission shall find necessary in order that such holding company shall cease to be a holding company with respect to each of its subsidiary companies which itself has a subsidiary company which is a holding company." Section 11 (e) requires any plan of reorganization approved by the Commission to be "fair and equitable to the persons affected by such plan."

Acting under these provisions of § 11 the Commission has ordered that United be "liquidated and dissolved" as a step in the simplification of the holding company structure, so that United shall cease to be a holding company as commanded by § 11 (b) (2), and its stockholders shall become stockholders in its subsidiary, Railways Co. The Commission, in ordering dissolution and liquidation of the company, and providing for the distribution of its assets, found that the stipulated priority of the preferred stock is far in excess of the present value of the company's assets. It said that if the stipulated priority "is controlling, our inquiry must perforce be ended at this point in a decision that the preferred stock is entitled to all the assets of the corporation to the exclusion of the common."

Nevertheless, the Commission has ordered, and this Court sustains the order, that only 94.52% of the assets of the company be allocated to the preferred stock upon liquidation and 5.48% to the common. For purposes of liquidation the Commission measured the rights of the different classes of stockholders in terms of the estimated

value of their interests as though the liquidation which the Commission had ordered were not to take place and the corporation were to continue as a going concern. In short, in liquidating the corporation it determined, as the opinion of the Court declares, that in distributing the assets of the corporation among its stockholders the rights of the stockholders "may be evaluated on the basis of a going business and not as though a liquidation were taking place."

Peering into the future with almost clairvoyant percipience the Commission prophesied that if the company now being liquidated and dissolved were allowed to continue its operations it would, fifteen years hence, have paid all arrears of dividends on the preferred and would then be able to pay an estimated annual return on the common stock in excess of $2,500,000. This prophecy assumed average future earnings in excess of $6,000,000 a year, a sum which "actual earnings . . . have never in the past ten years exceeded . . ., except in 1942." This prognosis, the Commission thought, afforded justification for distributing the assets of the corporation upon its liquidation and dissolution, not according to the stipulated priority of the preferred stock upon liquidation, which is in fact taking place, or indeed in conformity to its priority right to current earnings if the company were to continue unliquidated. For by the Commission's order the preferred is required to surrender to the common what is the equivalent of more than 5% of its fixed priority right to the annual earnings from the assets of the company, which earnings of a "going business" would be required to satisfy dividends on the preferred before any payment of dividends on the common. The preferred stockholders are thus denied the priority for which they have stipulated on liquidation, and also the priority with respect to current earnings to which they would be entitled by virtue of their position as preferred stockholders if the company,

which has been in fact condemned to death by the Commission, is, as the Commission at the same time supposes, to be regarded as living and functioning as "a going business."

The judgment of the court below sustaining so extraordinary a result should, in our opinion, be reversed because the Commission, without authority in law and contrary to the command of the statute, has disregarded the plain terms of the corporate charter controlling priority of the preferred stock upon liquidation of the company whether voluntary or involuntary.

The opinion of the Court adopts for its support a ground which the Commission declined to adopt, and the decision of the Commission rested upon a second ground on which the Court appears not to rely. We think it clear that neither ground is supportable. The first is that the charter provision fixing the priority of the preferred stock in the event of "liquidation" was not intended to apply and is inapplicable to a "liquidation" like the present. For here, it is insisted, the liquidation, which has in fact been ordered and is being enforced, is nevertheless to be regarded as a fiction, and the interests of the different classes of stockholders are to be measured by resort to the fiction that they are continuing interests in a corporation which is not to be liquidated, but is to be continued as a going concern. The other ground, adopted by the Commission, is that if the charter provision does apply the Commission is free to override it by any plan of distribution which it finds to be "fair and equitable."

As to the first it is plain that the company is now being liquidated and dissolved; that the liquidation is involuntary; and that some of the corporation's assets are being distributed to the common stock before satisfaction of the stipulated priority of the preferred, and this with full knowledge of all concerned that the company is without assets to satisfy the priority. Since these are the precise

conditions on which the priority provision was, according to its terms, to operate, it is not apparent why this "liquidation" is not a "liquidation" within the meaning of the charter provision.

It is said that although the liquidation is involuntary, it is not within the charter provision, and that the stipulation for priority on liquidation may be disregarded because the Holding Company Act was enacted after the adoption of the charter, and hence the parties to the incorporation could not have contemplated a compulsory liquidation under its provisions. We find it difficult to suppose that a stockholder who stipulates for priority upon liquidation, whether voluntary or involuntary, is at all concerned with the particular source of the power which may compel the liquidation of his investment or with the purpose of its exercise. Unless words have lost their meaning, the stipulation for priority in this case cannot fairly be taken not to include any kind of a liquidation which would compel the surrender of the stockholder's investment and force him to sever his connection with the corporation in which he has invested.

When the preferred stock of the United was issued in 1929 there were numerous statutes, state and federal, which authorized liquidation and dissolution of corporations by government compulsion. See for example *Continental Insurance Co.* v. *United States,* 259 U. S. 156. It is the veriest fiction to say that investors in corporate securities at that time could not or did not consider the possibility of the addition of a single statute to this list, or that the stockholders of United by the stipulation for priority upon liquidation, voluntary or involuntary, intended to exclude from its operation any method of involuntary liquidation which would affect their interests. To conclude that the present stipulation for priority upon involuntary liquidation did not envisage a liquidation such as this one seems like saying that an insurance policy

payable on the death of the insured creates no obligation if the insured dies from a disease which was unknown when the policy was written.

We cannot assent to the proposition advanced by the Commission that even though the priority stipulation was intended to be applicable to any kind of an involuntary liquidation, including one such as the present, the Commission can nevertheless override it. Such provisions for priority in a corporate charter constitute a contract among the stockholders, which is entitled to constitutional protection, *Bedford* v. *Eastern Building & Loan Assn.*, 181 U. S. 227; *Hopkins Federal Savings & Loan Assn.* v. *Cleary*, 296 U. S. 315; *Treigle* v. *Acme Homestead Assn.*, 297 U. S. 189, 194–6, impairment of which is not lightly to be attributed to Congress. No constitutional issue is raised here, but we find no provision of the statute which purports to confer on the Commission, in the exercise of its power to liquidate a corporation, any authority to set aside a lawful stipulation in which the stockholders have joined fixing their relative rights in the event of liquidation.

On the argument of this case counsel for the respondent referred to the Commission's action in setting aside the contract as an exercise of its power to "remold" the contract. Whether this characterization of the Commission's action may be thought to render it more palatable to the preferred stockholders whose lawful contract has been set aside by the Commission, it is plain that in the absence of some controlling direction of the statute there are no circumstances here which call for the exercise of any implied power of the Commission or court to readjust or restate the rights of the stockholders without regard to their contract. There is no suggestion that the present stipulation is unlawful, oppressive or inequitable, or subject to any other infirmity; or that it is incapable of being carried out in the present liquidation to which it applies.

Hence there is no basis for the exercise of equity powers to adjust the rights of parties to a contract which has been set aside; or for the Commission's argument, which the Court of Appeals below seems to have sustained, 142 F. 2d 411, 419, that the action of the Commission is supportable as an exercise of the judicial power to make an equitable disposition of the rights of the parties to a frustrated contract. Cf. *New York Trust Co.* v. *Securities & Exchange Commission,* 131 F. 2d 274.

So far as the Commission has authority to liquidate any corporation, liquidation is only a step in the simplification of a holding company system or the elimination of an undesirable holding company, which are the avowed purposes of the Act. The Commission does not reveal how the distribution of the corporate assets, upon which the stockholders have agreed, would hamper the simplification or the elimination of the liquidated company; or how the different distribution ordered by the Commission would facilitate them. It seems wholly irrelevant to the achievement of these, which are the avowed purposes of the Act, whether the stockholders of the dissolved corporation share in its assets in one proportion or another. Neither the Commission, the public, nor the stockholders have any ground for complaint so long as the agreed priority rights to the distributed assets remain unaltered.

The Commission has found its authority for setting aside the priority stipulation in the requirement of § 11 (e) that the Commission must find that any plan it approves for elimination of a holding company is "fair and equitable." As we have already indicated, the Commission has said that it is "fair and equitable" to deprive preferred stockholders, in the event of liquidation, of the rights for which they have stipulated and paid in order to compensate the common stockholders for rights which they are said to have lost because of the liquidation. But such compensation of the common stockholders at the expense

of the preferred is contrary to the priority stipulation by which both are bound. The common stockholders, like the preferred, have no right not to have the company liquidated and are entitled to no compensation merely because it is liquidated. Their rights as stockholders cannot survive liquidation and dissolution of the company, and in that event and because of it and because of the stipulation neither can assert rights which they could enjoy only if the corporation were to continue as a going concern.

We can find no basis for saying that it is not fair and equitable, both in a technical as well as a general and non-technical sense, to require the stockholders to abide by their agreement in the very circumstances to which it was intended to apply, and where, as we have said, there is no contention that the contract when made was or is now oppressive, unfair, inequitable or illegal. But beyond this we think it is quite clear that the requirement of § 11 (e) that the plan be "fair and equitable," instead of furnishing authority for the deprivation of shareholders of their priority in liquidation, is a prohibition against it.

The phrase "fair and equitable" as applied to any form of corporate reorganization has long been recognized as signifying the requirement of the rule sanctioned by this Court in *Northern Pacific R. Co.* v. *Boyd,* 228 U. S. 482, and the many cases following it. The rule is that any arrangement or plan enforced without the consent of the parties affected by it, by which the subordinate rights and interests of stockholders are attempted to be secured at the expense of the prior rights of other security holders, is unfair and inequitable and will not be judicially sanctioned. See *Case* v. *Los Angeles Lumber Co.,* 308 U. S. 106, and cases cited. This rule is applicable with respect to the priorities of different classes of stockholders as well as to priorities between creditors and stockholders, and for the same reasons. *Case* v. *Los Angeles Lumber Co., supra,* 119, note 14.

In the *Los Angeles* case, *supra,* we held that the words "fair and equitable" had so long been recognized and applied as signifying this rule of priority among security holders in corporate reorganizations as to have become words of art, and that their adoption by § 77B of the Bankruptcy Act, as applicable to reorganizations under that section, must be taken to have incorporated the rule of the *Boyd* case in the statute, in the absence of any context requiring a contrary construction. We think no other construction of § 11 (e) of the present Act can be sustained. Neither the context of the statute nor the legislative history suggests any other. The Commission hints at no reason for not giving these terms of art, "fair and equitable," other than their long settled and hitherto accepted meaning.

The Commission justifies its departure from the rule here only by recurrence in its brief to the proposition that "the essence of the reorganization process is the remolding of contract rights and the substitution therefor of equitable equivalents." To this the answer is that the Commission in this case is liquidating and dissolving, not reorganizing, United, and that it is without authority in such a case more than in a reorganization to alter or disregard a contract fixing the priorities of stockholders, and that in depriving the preferred stockholders of their priority rights the Commission has substituted no equivalent for them, either legal or equitable. In fact it has substituted nothing for the priority rights which its order destroys.

The Gold Clause Cases, *Norman* v. *B. & O. R. Co.,* 294 U. S. 240, afford no analogy and lend no support to what is now adjudged. There Congress, with the authority of an express provision of the Constitution, explicitly altered existing contracts. Here Congress has commanded the Commission to respect contract rights by requiring that its action conform to the well defined meaning of the phrase "fair and equitable." Congress seems to have recognized that the stipulated priorities of stockholders were

not to be disturbed in liquidations ordered under the Public Utility Holding Company Act. The report of the Senate Committee (S. Rep. No. 621, 74th Cong., 1st Sess., p. 33) recommending the enactment of the present statute and proponents of the Bill (H. R. Rep. 1318, 74th Cong., 1st Sess., pp. 49–50; 79 Cong. Rec. 4607, 8432) repeatedly cited *Continental Insurance Co.* v. *United States, supra,* in which it was held that the distribution in a liquidation compelled by the enforcement of the Sherman and Hepburn Acts must preserve the stipulated priorities of the several classes of stockholders of the offending corporation.

The intimation that the priority stipulation can be disregarded in the present liquidation because the Commission could have effected the simplification of the holding company structure by merger, consolidation or recapitalization, is merely to say that such procedure would not involve liquidation, voluntary or involuntary, or, what comes to the same thing, that the preferred stockholders could not claim the protection of the priority stipulation in situations to which it does not and was not intended to apply. By buying preferred stock the preferred stockholders paid for the privilege of membership in the corporation and for participation in the fruits of the corporate enterprise, to continue, with full priority of dividends so long as the corporation should continue as a going concern. But in the event of liquidation they stipulated and paid for the specified priority over the common stockholders in the distribution of the net corporate assets. The preferred stockholders here assert only the rights to which that stock is entitled on liquidation by the terms of the priority stipulation. Calling the preferred stockholders' right of priority a "windfall" will not serve as an apology, explanation, or justification for the Commission's action in appropriating the priority of the preferred in order to give a windfall to the common. It is no answer to say that their claim on liquidation might have been avoided by not liquidating or to say, as the Commission has ordered, that they must

accept on liquidation less than their stipulated priority on liquidation and less than the rights to which they would have been entitled if the corporation had continued as a going concern.

The judgment should be reversed.