### SECURITIES AND EXCHANGE COMMISSION et al. v. LEVENTRITT.

#### No. 156, Docket 21566.

**United States Court of Appeals Second Circuit.**

Argued Jan. 4, 1950.

Decided Feb. 1, 1950.

Roger S. Foster, Washington, D. C., for Securities and Exchange Commission.

Lauman Martin, New York City, for Niagara Hudson Power Corporation.

M. Victor Leventritt, New York City, for appellant.

Before L. HAND, Chief Judge, SWAN and CLARK, Circuit Judges.

L. HAND, Chief Judge.

The appellant is the holder of "warrants," issued by a public utility holding company, which was in voluntary reorganization under § 11(e) of the "Public Utility Holding Company Act of 1935."[1] Each "warrant" gave the holder a perpetual right to call upon the company to issue one and a sixth shares of common stock at $50: i. e., a "call" on the common shares at $42.86 a share. The "Plan" submitted by the company did not provide for the issue of any substitute for the "warrants" by the new corporation, which was for the most part an operating company. To this feature of the "Plan" the appellant objects: he insists that, if no securities of the new company are to take the place of the "warrants," at least some cash must be paid upon their extinction. The Securities and Exchange Commission, upon consideration of the history of the company and of its "foreseeable" future, aided by a

---

1. § 79k(e), Title 15, U.S.C.A.

computation of "unaffiliated" engineers, concluded that the "warrants" had no value and approved the "Plan" in this, as in almost all other respects. On petition by the Commission to the district court to "enforce" the "Plan" under § 11(e) of the Act[2] the judge granted an "enforcing" order, from which this appeal has been taken.

Section 11(a)[3] imposes the duty upon the Commission to decide how far the "corporate structure" of a registered holding company "may be simplified" and "unnecessary complexities therein eliminated"; and in the discharge of that duty the Commission was free to eliminate such securities as these, constituting as they did a perpetual right to demand an increase in the common shares of the new company. Such a possible future increase in the capital of a public utility company might well be deemed, certainly a needless, and perhaps a disturbing, "complexity" in its "structure." Indeed, we are not sure that the appellant seriously disputes this omission from the "Plan"; he does insist, however, that any such action must be conditional upon giving the "warrant" holders a fair equivalent in cash; and the Commission and the company concede as much. Therefore, the only issue is whether it was permissible to appraise the "warrants" as worthless.

The evidence consisted of quotations over a period of about twenty years of the common shares of the old company, and of the "warrants"—the last presumably bought and sold "over the counter"—; and of an estimate by the expert of the probable future earnings of the new company. The quotations showed no steady proportion between the value of the shares and of the "warrants," though that was indeed to be expected, for the lower the value of the shares, the less the chance that a call at $42.86 could ever have any value. An examination of the quotations confirms this *a priori* inference. For example, during the four years, 1941–1944, when the shares were at the lowest, the average of the low for the shares was about one and a half, and the average of the low for the "warrants" was one-sixteenth, so that proportion was about one to twenty-four. On the other hand, in the six high years, 1933–1939, when the average of the high for the shares was nearly thirteen, and the average of the high for the "warrants" was two and a half, the proportion was about one to five. This variation was not important; what was important was that at no time did the "warrants" become worthless, not even when the shares had gone down to their low of seven-eighths. The Commission estimated the present value of the old shares at sixteen; and if we look to the years, 1933, 1936, 1937 and 1946, when the high of the shares varied between fifteen and eighteen and a quarter (with an average of about sixteen), the corresponding high of the "warrants" varied between two and a quarter and five (with an average of about three and a half), the proportion being then about one to four and a half. So far, therefore, as a long series of sales is evidence of value, the "warrants" had substantial value.

When we turn to the estimate by the expert, based upon the prospective earnings of the new company for the four years following the "Plan"—1949–1952—this conclusion is fortified. The average for these was about twenty-two million dollars, which the Commission cut to sixteen and a half millions and it estimated that the new shares might safely expect dividends of no more than $1.40. Taking fifteen as a fair capitalizing figure, the new shares would be worth in the neighborhood of $21. The old shareholders were given .78 of a new share for one old share upon the payment of one dollar twenty or one dollar sixty per share. Thus, even though we take the higher payment, the old shares on this appraisal were worth $14.78 a share and the "warrants" had a substantial value. In conclusion, therefore, not only can we find nothing in the record to support a finding that the "warrants" were worthless; but there is positive evidence

---

2. § 79k(e), Title 15, U.S.C.A.

3. § 79k(a), Title 15, U.S.C.A.

from several lines of approach that they had a very real value.

There is a dearth of authority in the courts touching the appraisal of such property; we have found no other decisions than our own in Re Electric Power and Light Corporation,[4] affirming a finding of the Commission which appraised "warrants" at one-third the value of shares worth $25; and the decision of Chief Judge Leahy in Re Commonwealth & Southern Corporation,[5] which affirmed a finding of the Commission that the "warrants" were worthless. Before it decided the case at bar the Commission had ruled upon the point in only three cases, two of which were those just mentioned, and the third, in the reorganization of the Community Gas & Power Company.[6] In the last case the "warrant" holders had a call upon the shares at five dollars, which the company's "Plan" recognized by giving them, one new share for every five "warrants," as against one-half a new share for each old share of common. This the Commission raised to one-third of a share for each "warrant." The denial of all value to the "warrants" in Re Commonwealth & Southern Corporation was because the call was at $30 a share, and the shares had never after 1931 sold for more than $6-⅞; so that the call could have no value unless the old shares rose to four and a half times their highest value since that year. Moreover, there was no evidence that the "warrants" had ever sold in any market.

■ Like every other option, "warrants" are inevitably aleatory; they are the result of a willingness to pay cash for the chance that the market's judgment as to the future of the property may be too unfavorable. That willingness may, or may not, be the result of a rational forecast; and if it were possible to separate those instances in which it is a rational forecast from those in which it is a mere throw of the dice, it might be desirable to refuse protection to the second. We may even assume *arguendo* that because of the possibility that the forecasts may be no more than a gamble, Congress might sweep away all such options, and deny them recognition. However, until it does so we must suppose that that recognition which the law in general gives them, Congress did not mean to withdraw in reorganizations. The Commission has never even remotely intimated an opposite opinion; and the decision of the Supreme Court in Otis & Co. v. Securities and Exchange Commission [7] appears to us to have recognized property whose value was quite as speculative as this. In that case the common shares of a company in reorganization had no "equity" over the preferred shares at the existing values of the assets, yet the Commission allowed them something out of the pockets of the preferred; and the court affirmed its ruling. That necessarily involved holding that, although the estimate of "foreseeable" earnings did not justify a conclusion that they would ever leave a margin over the preferred dividends, the chance that there might be a margin was not to be denied the common stock which had contributed to the original venture.

In the course of its opinion in the case of the Electric Bond & Share Company, the Commission, in speaking of such "warrants," said: "it appears that a substantial portion of the market's valuation of the warrant derives from the greater speculative possibilities provided by like amounts of capital, if used to purchase warrants rather than common stock." That may well be true, and the Commission was of course free to use it as a factor in its appraisal of the "warrants" at bar, although it is indeed a nebulous factor. But any appraisal whatever must be largely composed of nebulous factors, and, to speak frankly, can at best be no more than as honest a guess as possible. Besides, it must

4. 2 Cir., 176 F.2d 687, 691.

5. D.C., 84 F.Supp. 809.

6. In re Community Gas & Power Company et al., Holding Company Act Release No. 6436.

7. 323 U.S. 624, 65 S.Ct. 483, 89 L.Ed. 511.

be remembered that the finding that the "warrants" at bar had no value whatever was just as much of a guess, as a finding that they had some particular value. We are forced to deal in prophecies in any event; and, unless courts are to have no review at all, they cannot avoid acting upon such impalpable ingredients. Clearly there can be appraisals which no "substantial evidence" supports; and one guess is not as good as another, unless all findings of the Commission are to be final. Hence, much as we hesitate to interfere upon such an issue, we cannot agree that there was any evidence "substantial" or insubstantial to support the finding that these "warrants" were wholly worthless. We have no intention of suggesting what that value should be; that is for the Commission to decide; all we hold is that the record as it stands does not in our judgment justify the finding actually made.

That part of the order of the District Court which enforces the provisions of the appellee's Dissolution Plan relating to the outstanding Class B stock option warrants of appellee be and it hereby is reversed; cause remanded for further proceedings not inconsistent with the foregoing opinion; in all other respects the appeal is dismissed.

CLARK, Circuit Judge (concurring in the result).

The attack on the plan's treatment of these warrants developed only at the very end of the proceedings before the Commission, and apparently then appeared as a small issue amid a series of other important ones. Because of this it does not appear in the record that the Commission considered the market quotations, now deemed so important; and I am willing to have the cause go back to the Commission to make new and more detailed findings as to the value of these warrants. But I do wish to emphasize that we cannot now properly make any decision that the warrants do have more than a purely nominal value; and if the opinion can be taken as so intimating, I must express disagreement. The opinion cites and relies only on these market quotations and does not mention the strong case the Commission builds to show that, except for a gambler's chance in the market, the warrants will never produce results from the holders. This is based on past, present, and prospective earnings, and the small possibilities of increased income in this state-regulated utility to a point where the vast gap between present values and those necessary to make the warrants usable will be made up; it represents in general the values soundly to be put upon the various security interests in any but a speculative market.

Thus the old shares would have to treble from the value of $14.78, which the court now puts on them in the light of market quotations, to something above the $42.86 exercise price before the warrants would have any value so far as actual use is concerned. Perhaps no one can say beyond peradventure that the price of the shares may not increase to that remarkable extent or that New York may not let the business thus prosper. But a function of the Commission is to gaze into the future; and it is within its province to evaluate as best it can the possibility of such prosperity. *De minimis non curat lex* is still a salutary principle; and if, as the Commission now argues persuasively, the possibility of these warrants ever having any exercise value is so remote as to be unreal, then payment to the warrant holders is not only not necessary, but positively unlawful.

The court is properly concerned with protecting the warrant holders from the destruction of any valuable right they may have. If these warrants do have any real value and they are awarded a lesser sum or adjudged completely worthless, a confiscation will be worked which the Commission, in common with our court, would abhor. But we must not overlook the fact that the reverse is also true, and that to pay these warrant holders any more than the real value of their warrants is to take assets unjustly from the owners of the common stock. Care must be taken lest the emphasis on rights be all one way. Valuation of future contingencies is not an exact science, and the Commission can only make its best expert guess. While I

agree that it must consider the market quotations for the warrants, it will then be for it to decide how far, if at all, this rebuts the strong arguments heretofore presented that the warrants are without any substantial value.