FEDERAL LIQUIDATING CORP. v. SECURITIES AND EXCHANGE COMMISSION.

EDELSTEIN et al. v. SECURITIES AND EXCHANGE COMMISSION.

Nos. 116 and 135, Dockets 21745, 21746.

United States Court of Appeals, Second Circuit.

Argued Feb. 6, 1951.

Decided March 16, 1951.

Swan, Circuit Judge, dissented in part.

Frueauff, Burns, Ruch & Farrell, New York City, for Federal Liquidating Corp.

Theodore Johnsen, New York City, for petitioner.

Frank Weinstein, New York City, for Edelson.

Samuel Levinson, New York City (Robert Bernstein, New York City, of counsel), for petitioners.

Roger S. Foster, General Counsel, Myron S. Isaacs, Chief Counsel, Division of Public Utilities, Ellwood L. Englander, and M. Morton Weinstein, attorneys, Securities and Exchange Commission, all of Washington, D. C., for respondent.

Before L. HAND, Chief Judge, and SWAN and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Chief Judge.

The Federal Liquidating Corporation has petitioned to review an order of the Securities and Exchange Commission, which allowed a premium of $10, with interest to the preferred shareholders of the Federal Light and Traction Company above the "par" of their stock. Edelstein and several other shareholders of the Cities Service Company—itself the former holder of more than a majority of the shares of the Federal Light and Traction Company—have filed a similar petition in their own interest; we speak of both collectively as the petitioner. The order was entered on June 19, 1950; it disposed of an issue which the Commission had reserved for future decision by an earlier order of September 11, 1947, which had granted a petition, filed in September, 1946, of the Federal Light and Traction Company—which we shall speak of as the "Company"—for leave to liquidate. That petition was itself the outgrowth of a proceeding, commenced by a petition of the Commission, filed on March 4, 1940, under § 11(b) (1) of the Act,[1] which sought to compel the "Company" to consolidate the operating utility companies which it then controlled, and which consisted of one such company in New Brunswick, four in the State of Washington, a holding corporation in Arkansas which held shares in several Arkansas operating companies, one operating company in Missouri, two in Wyoming, two in Arizona (one a transit company), four in New Mexico, one in Colorado, and a small real estate corporation in Arizona. These subsidiaries were what remained of twenty-five companies controlled by the "Company" in 1935 when the Act was passed. The petitioner asserts that the "Company" had reduced its holdings to those which remained in 1940, for business reasons, in no way actuated by the possibility that the Commission might eventually take steps against it under the Act; and so we shall assume. Indeed, the Commission appears to take that position, though it is not convinced that the prospect of a "simplification proceeding" may not have had something to do with the "divestments." Although presumably there had been hearings meanwhile, the Commission took no official action on the petition until August 17, 1943; and during the intervening period the "Company" had still further reduced its holdings. It had disposed of its interest in the New Brunswick company, in the Washington companies and in the Arkansas holding corporation; so that it retained only one company in Missouri, two in Wyoming, two in Arizona, four in New Mexico, one in Colorado and the real estate company in Arizona. By the order of August 17, 1943, the Commission directed it to dispose of its holdings in all these companies except the Arizona utility company, the four New Mexico companies and the Colorado company; and on March 30, 1944, it further directed that, after it had done so, it must choose between holding the Arizona company on the one hand and the New Mexico companies combined with the Colorado company on the other. By June, 1946, the "Company" had made up its mind to sell, and did sell, the Arizona company; and before September 13, 1946, it had consolidated the four New Mexico operating companies into one operating company, and had sold the Colorado company. Thus by that date it had become a holding corporation of only the combined New Mexico companies, and on this account it petitioned for leave to liquidate. The Commission, after hearings on this petition, on September 11, 1947, granted leave to liquidate, and approved a plan of distribution. While this proceeding was pending, the issue

1. Sections 79 et seq., 79k(b) (1), Title 15 U.S.C.A.

arose as to what should be the distributive share of the preferred shareholders, and that issue was reserved, as we have said, and was finally disposed of by the order now on appeal.

The "Company" had issued about 525,000 common shares with a par value of $15, and about 43,000 preferred without par value. The charter provided that "in the event of any liquidation or dissolution or winding up of this corporation, whether voluntary or involuntary, the holders of preferred stock shall be entitled to be paid in full the par amount of their unpaid shares" with unpaid dividends; and the parties agree that for the purposes of this suit the curious locution—"par amounts of their unpaid shares"—is to be taken as the equivalent of a true par of $100 a share. The charter contained a provision for redeeming the shares at $110 "at any dividend date"; and the only matter in dispute is whether the preferred shares should be allowed that amount with accrued dividends. By the order of September 11, 1947, the preferred shareholders were at once to receive $100 and accrued dividends, and a fund—the "Escrow Fund"—was set aside, equal to $10 on each share, plus $1.64, which it was thought would meet any interest which might become due upon $10 at 5.45 per cent until the reserved question was decided. The position of the petitioner is that, since the "Company's" liquidation was voluntary and under the law of the state of its incorporation—New York—the Commission had no power to modify the provisions of the charter which allowed the preferred shareholders in liquidation only the "par" value of their shares. The petitioner further says that, even if this is not true and, if the Commission had power to ignore the charter, the facts did not justify the inference that the liquidation was a result of the proceeding of 1940, because, regardless of that proceeding, the "Company" would have stripped itself down to the condition in which it was in 1946. There were, it says, special and local reasons in each case which made necessary the disposal of all the holdings with which it

parted. Finally, the petitioner argues that, even if it is wrong upon both issues, there was no basis for allowing so high a premium as $10. The Commission overruled all these objections and on June 19, 1950, entered the order on appeal. A subsidiary objection to this order is that, although the "Escrow Fund" was enough to pay interest for three years from September 11, 1947, at 5.45 per cent, the appeal has come on after September 11, 1950; and the order has allowed interest upon the premium until it was paid, which will more than exhaust the "Escrow Fund."

The Commission justifies its disregard of the charter on the ground that such provisions presuppose that the enterprise undertaken by the incorporators has terminated for other reasons than the compulsion, by order or by anticipation of an order, of the Commission. They contemplate either that the venture has failed, or the persons interested have found better uses for their money, or that some other occasion has arisen. They do not contemplate interposition of a power alien to the venture, like the Act; and for that reason it is "fair and equitable" within the meaning of § 11(e) to ignore them, and to divide the proceeds as though the corporation had lived out its life undisturbed except by the hazards of its affairs. Whether that be right, at least it is clear that the literal meaning of the charter is not a reliable test. As in the case of any other contract we are to ascertain, as best we can, what the parties would have specifically said, had they been faced with the occasion that arises.[2]

The petitioner invokes as a controlling precedent, the ruling of the Commission in Re El Paso Electric Company;[3] where it accepted the charter as controlling, and where, it says, the facts were parallel. The Commission itself thought that its two rulings could be reconciled; but we do not find it important to decide whether it was right. If they cannot be reconciled, the earlier one has been overruled and is no longer a precedent,

2. Restatement of Contracts, § 235 (d), Comment e.

3. H. C. A. Release 5499 (1944).

even to the extent that rulings of the Commission are to be deemed authoritative. As for the decision of the First Circuit in Lahti v. New England Power Association,[4] It is enough to quote the following language of Magruder, J., 160 F. at page 855: "The chance of liquidation cannot be expressed in terms of mathematical exactness, but the weight to be given this factor was primarily for the 'Commission to decide. After weighing this factor in the light of the whole record, the Commission's over-all judgment was 'that the allocation of $36 in cash and one share of new common stock accords such stockholders fair and equitable treatment.' We think this finding of equitable equivalence must be accepted by us." However, it is not in our opinion necessary to consider the decisions of the Commission or of the lower courts, because Otis & Company v. Securities and Exchange Commission, 323 U.S. 624, 65 S. Ct. 483, 89 L.Ed. 511; and Securities and Exchange 'Commission v. Central-Illinois Securities Corporation, 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836, have laid down the principle applicable to all such situations, as we have already stated it. In the first of these the Commission denied the preferred shareholders even the par of their shares which the charter allowed on liquidation, although the plan gave something to the common shares; in the second it allowed the preferred shares the premium at which they might be redeemed. In each case the Court affirmed the order on the ground that the charter provisions did not apply; they were not to be read as intended to cover liquidations forced by the Act. It is true that in each case the Commission had ordered liquidation and that the proceeding was a "simplification" under § 11(b)(2), and not an "integration" under § 11(b)(1). The petitioner makes much of these distinctions but they are irrelevant, if one considers the *ratio decidendi*. If liquidation is forced upon the corporation by the results of earlier orders of the Commission, or by a justified apprehension of what it will demand, so that no alternative tr liquidation is left, there is as much reason to regard a liquidation as forced by the Com-

mission, as though it had been ordered. Indeed, a contrary conclusion would open to common shareholders who usually control, an escape from the control of the Commission by liquidation, voluntary in form, though enforced in fact. As for the distinction between § 11(b)(1) and § 11(b)(2), it appears to depend upon the accident that both the Supreme Court decisions concerned "simplification" proceedings under § 11(b)(2). To make that a condition upon the doctrine would falsify its whole meaning.

 Two questions remain: (1) whether the liquidation of the "Company" was in fact forced by the proceeding begun in 1940; and (2) if so, what would have been the value of the preferred shares if the Commission had not intervened? Even though we disregard all "divestments" between 1935 and 1940, at the end of that period the "Company" still had control of twenty-one subsidiaries, counting the Arkansas operating companies and the Arkansas holding company as five. By the time the Commission entered its order of August, 1943, this number had been reduced to eleven. That order directed the "Company" to lop off all of those left except the Arizona utility company, the Colorado company and the four New Mexico companies; and it was followed in a few months by a further order requiring an election between New Mexico and Arizona. The "Company" took over two years to dispose of all those which it was forbidden to keep, together with the Colorado company, which it had been free to keep; and finally, in June, 1946, elected to hold the New Mexico companies, which it consolidated into one operating company at about the same time. Thus it appeared that for a period of six years it had pursued a course which, at least on its face, gave the appearance of an attempt to anticipate some action by the Commission in the pending proceeding. That, of course, did not prove the point, for motives are difficult to fathom and the issue was as to motive. Nevertheless, it did justify a point of departure, so to say; the Commission might properly proceed on

4. 160 F.2d 845.

the premise that there was, *prima facie*, reason to suppose that these successive "divestments" had their origin in an effort to prepare for the inevitable, and that they called for an affirmative showing to match the inference. That showing the petitioner did make; it called the "Company's" former vice-president, who testified in detail as to circumstances which caused each subsidiary to be lopped off. He said that either it had proved unprofitable, or that condemnation appeared certain, or that something else had happened which would have required the "Company" to cast it away, regardless of the Commission or the proceeding. That may all have been true. In the case of the New Brunswick and the Arkansas companies, the finding of the Commission was that there was "substantial support * * * that strong business reasons existed" for parting with them; and indeed the language of the Commission's opinion is so equivocal that we cannot regard it as an affirmative finding. But the Commission took up all the other subsidiaries in scrupulous detail and concluded that the "Company" would not have disposed of them except for the imminence of some action in the proceeding. That analysis, based upon earnings and balance sheets and the like, justified disregarding the testimony of a single witness, who was certainly not impartial. And this was particularly true when that testimony is contrasted with the declarations of the "Company" itself. In a letter which it submitted to the Commission for issue to its shareholders in explanation of the proposed liquidation, it said nothing of any business reasons which had made the "divestments" desirable; the only reason it gave was that the "requirements of the Public Utility Holding Act left your Company with such a small part of its investments in public utility companies and such a large amount of cash which cannot be advantageously invested that your management concluded that the continued existence of your Company is no longer in the best interests of its stockholders." The letter actually sent out to the shareholders was even more categorical: "The dissolution and liquidation of your Company has become necessary in the course of effectuating the integration and simplification requirements of the Public Utility Holding Company Act." These statements serve also to confirm the "Company's" resistance to the Commission's efforts to compel it to abandon at least five and perhaps six of the subsidiaries. When on such a record the Commission has concluded that, had there been no proceeding, the "Company" would have retained enough subsidiaries to justify its continuance as a holding company, our function is at an end; and, indeed, in this instance we are not sure that we should not have decided the issue in the same way, had it come before us in the first instance, and not as a bare question whether there was "substantial evidence" to support the findings.

There remains the appraisal of the "premium" to which the preferred shares were entitled, if there was any. As to this also, the Commission in painstaking detail checked the prospects of the "Company" by two tests: (1) on the assumption that it had retained the Arizona, New Mexico, Colorado and Wyoming properties; (2) on the assumption that the money realized from sales of all that it did sell had been reinvested in income bearing securities. It examined the prospects of each of the subsidiaries separately, basing its consideration upon its past earnings, and forecasting its future as well as it could. It then considered what the proceeds of the "divestments" might have earned, invested in public utility companies. There was no better method; and, although no approach to assurance, even approximate assurance, was possible—for any figure was bound to be only an honest guess—we do not see that in this instance less "substantial evidence" supported the appraised value than was inevitable. It was certainly permissible to believe that the preferred shares were entitled to *some* premuim; and, that once granted, to hit upon the particular value was to embark upon unknown seas. The Supreme Court has very recently considered the whole subject [5] in a case in which we had thought that the Commission's ap-

5. Niagara Hudson Power Corp. v. Leventritt, 340 U.S. 336, 71 S.Ct. 341.

praisal was in the face of the only evidence. In reversing our decision it said, 340 U.S. at page 346, 71 S.Ct. at page 346: "In determining the fairness and equity of compensation to be allowed holders of warrants, the Commission is not bound as a matter of law, any more than in the case of other securities, to limit itself precisely to the values which the market recognizes. The informed judgment of the Commission, rather than that of the market, has been designated by the Act as the appropriate guide to fairness and equity within the meaning of the Act." We take this to mean that the appraisal of an investment security, involving as it must the forecast of its future earnings, enjoys a rather larger measure of invulnerability to review by courts than even that customarily accorded to administrative findings. Certainly the subject matter justifies some such preferred position. We doubt therefore that our function goes further than to assure ourselves that the Commission has taken into account all the relevant factors, and that its finding bears internal evidence of a solicitude for the rights of all concerned. It is dangerous to generalize too far, but so much at least seems to us established: that before we are justified in disturbing such a finding we must be altogether confident that the figure was beyond any rational acceptance. We are by no means so confident in this case.

 A final question arises as to the allowance of interest beyond the amount of the "Escrow Fund," which only covers the period up to September 11, 1950. We are not advised why it should have taken over two and one half years to decide the issue as to the premium; but one thing at least is certain—the preferred shareholders were not responsible for the delay. Meanwhile they will lose interest after September 11, 1950, unless the order of July 19, 1950, stands. The order of September 11, 1947, reserved jurisdiction "specifically" over any "additional amounts" which the preferred shares were "entitled to receive," and "generally * * * to entertain such further proceedings, to make such supplemental findings, and to take such further action as it may deem appropriate." The

"Escrow Fund" had been set up before the order was entered under a contract between the liquidating company—the petitioner—and the "Company"; so far as appears, the preferred shareholders were not parties to it. As we have said, the order of September 11, 1947, provided for a "distribution" to the preferred shareholders of an immediate payment of $100, of accrued unpaid dividends, and of "certificates of contingent interest" in the "Fund"; and this "distribution" was to result in the "cancellation and complete liquidation" of the shares. Taken without the reservation we have quoted, we should agree that this meant a definitive discharge of any further claims; and it is no doubt possible to read the reservation as limited to an appraisal within the amount of the "Fund" of those "additional amounts" to which the shares shall be "entitled." But it does not seem to us necessary so to limit it. Section 11(e) imposes on the Commission the duty to approve only such "plans" as are "fair and equitable to the persons affected"; and we are disposed to hold, not only that it was within its powers to vary the terms of the original plan in so trifling a matter, but that the specific reservation should be understood to leave to it that much latitude. That it exercised its discretion wisely, if it had any, seems to us apparent.

Order affirmed.

SWAN, Circuit Judge (dissenting in part).

I concur except as to the allowance of interest in excess of the amount of the Escrow Fund. The plan approved by the order of September 11, 1947 provided for the surrender and cancellation of the preferred stock on payment to the shareholders of $100 per share and accrued dividends, and for the issuance to them of Certificates of Contingent Interest which would entitle them to payment "out of the Escrow Fund" of such additional sum as the court might direct. This plan was found fair and equitable and no one appealed from it. Apparently all parties assumed that the question reserved would be decided promptly enough

so that the Escrow Fund would be adequate. I think that the holders of the Certificates of Contingent Interest should be held to have assumed the risk of delay and should be confined to what the Escrow Fund gave them.