THERON A. WOODSUM

MAURICE A. BOWERS

AUBURN SAVINGS BANK

EASTPORT SAVINGS BANK

SKOWHEGAN SAVINGS BANK

*vs.*

PORTLAND RAILROAD COMPANY

CENTRAL MAINE POWER COMPANY

PORTLAND COACH COMPANY

CUMBERLAND COUNTY POWER AND LIGHT COMPANY

PUBLIC UTILITIES COMMISSION OF THE STATE OF MAINE

Cumberland.   Opinion, February 28, 1949.

*Franklin R. Chesley,* for appellants.

*Nathaniel W. Wilson,*
*Everett H. Maxcy,*
*Hutchinson, Pierce, Atwood and Scribner,*
     for Central Maine Power Co. and
     Cumberland County Power & Light Co.

*Leon V. Walker,* for Portland Railroad Co.

SITTING: THAXTER, TOMPKINS, FELLOWS, JJ., AND MURRAY, Active Retired Justice.

THAXTER, J. This is a Bill in Equity brought by the Auburn Savings Bank of Auburn, the Eastport Savings Bank of Eastport, and the Skowhegan Savings Bank in Skowhegan, all located in the State of Maine and being organized as banking corporations under the laws of the State of Maine, against the Portland Railroad Company, hereinafter referred to as Railroad Co., a public utility corporation organized under the laws of this state, which for many years prior to the abandonment of its trackage had operated a street railroad system in Portland and its environs, against the Central Maine Power Company, hereinafter referred to as Central Maine, a public utility corporation organized under Maine law, which operates an electric light and power system within the state, and against the Portland Coach Company, hereinafter referred to as Coach Co., also a corporation organized and existing under the laws of this state, which operates a bus transportation system in Portland and certain outlying communities. By amendment of the bill, the Cumberland County Power & Light Company, hereinafter referred to as Cumberland, another public utility corporation organized under Maine law, which has been merged with Central Maine, and the Public Utilities Commission of the State of Maine, were joined as parties defendant. Also Theron A. Woodsum and Maurice A. Bowers, both of Portland, stockholders in Railroad Co.,

were, subsequent to the filing of the bill, allowed to intervene as plaintiffs.

The bill which was filed February 5, 1945 alleges that the plaintiffs are stockholders in Railroad Co. and that they bring the bill on behalf of themselves and other stockholders similarly situated. The intercorporate relations of the defendants are described in detail, and particular attention is called to a lease dated February 1, 1912 by Railroad Co. to Cumberland of all of its street railroad, parks and other property, together with all the rights, privileges, and franchises owned or held under lease, except such franchises as are "necessary to preserve the corporate existence of the Railroad Company and its interest in the reversion of the demised estates and properties and its corporate seal and books of minutes." The lease was for the term of ninety-nine years, or until February 1, 2011. It is not necessary at this point in referring to the general allegations of the bill to discuss this lease or the consideration given by the lessee except to say that the rental to be paid and the method of payment were designed to assure to the stockholders of Railroad Co. dividends on their stock of $5.00 per annum during the term of the lease. The bill alleges that under an agreement dated November 18, 1942, Cumberland did, as of December 3, 1942, merge with Central Maine, which became the assignee of the railroad lease and agreed to assume the liabilities of its predecessors with respect thereto. The bill charges that this merger was a violation of the terms of the lease, participated in by interlocking directors and officers of the corporations concerned and that it culminated in a plan for dissolution of Railroad Co. which was to be submitted to its stockholders for approval at a stockholders' meeting to be held December 28, 1944. This plan, which we shall discuss in detail later, had been filed by Central Maine with the Securities and Exchange Commission purportedly under the provisions of the Public Utility Holding Company Act of 1935. The bill goes on to allege concealment from the stockholders of Railroad

Co. of facts with respect to the plan for dissolution, a failure of Central Maine to perform the covenants of the lease, a wasting and abandoning of the assets of Railroad Co., the unlawful substitution of a bus system for the street railroad, and a subsequent unlawful sale of such bus system. Interspersed with these specific allegations are assertions that these changes and unlawful acts were accomplished through the medium of interlocking directors and through a failure of the parties concerned to fulfill their fiduciary duties. The bill alleges that the reorganization plan submitted to the Securities and Exchange Commission was in fact conceived in fraud and for the purpose of terminating the obligations of the lessee or its assignee under the lease, all of this being done in collusion with those parties who were to benefit from the fraud; that the hearing on said plan before the Securities and Exchange Commission was solely on evidence prepared by the interested parties which was offered in pursuance of a scheme to create a self-serving necessity for its approval. The bill asserts that at the special stockholders' meeting of Railroad Co. called to consider the plan proxies were solicited on false information and that a sufficient number of them were invalid so as to render void the proceedings taken at the meeting, and furthermore that a majority of the total stock voted at the meeting was held by Central Maine whose action in voting it rendered the meeting itself invalid and all action taken to approve the plan void.

The relief sought under this bill is drastic in the extreme. In short, the bill sets forth certain alleged fraudulent and *ultra vires* acts engineered by the lessee and its assignee by reason of their control of the property of Railroad Co. under the lease, which acts it is claimed have destroyed certain rights of the stockholders of Railroad Co. under that lease, namely their right to have the street railroad system maintained in good repair and operated as a street railroad during the term of the lease, and at the expiration of the lease in 2011 A. D., or at its earlier termination, to have the de-

mised property surrendered to Railroad Co. "as a going concern, in condition not inferior to that existing at the date of the lease," together with all extensions, etc. In other words, the minority stockholders who bring this bill are insisting on the exact letter of their contract. In spite of changes in transportation methods in the thirty-five years since this lease was written, in spite of the abandonment of railroad trackage in our streets and the substitution of buses for street cars, the plaintiffs treat every variation from the exact terms of the contract as a breach of its terms, every sale of antiquated property as evidence of fraud. They ask this court to put things back in *status quo,* declare null and void all the acts complained of, in other words they seek to compel specific performance of the lease as written. To this end we are asked to issue mandatory injunctions and restraining orders and to appoint a receiver or receivers to take over the property involved. Prior to the bringing of this bill this matter had been submitted to the Securities and Exchange Commission which had already taken action under an overriding federal law inconsistent with the relief sought by this bill. It is therefore apparent that this court is being invited to take action which may well be in disregard of that delicate balance between state and federal power on which our system of government rests.

Answers were filed by all parties defendant admitting in part undisputed allegations of the bill; but each defendant in so far as it was concerned denied every charge of fraud. After the filing of replications, the bill came to a hearing before the Chief Justice who was fully conscious of the limits of his power set by the Public Utility Holding Company Act and endeavored as best he could to see that there was no conflict between federal and state authority. Had he had before him, as we have now, the recent case of *Schwabacher* v. *United States,* (U. S. Supreme Court May 3, 1948) 334 U. S. 182; 68 S. Ct. 958; 92 L. Ed. 1305, much of the exhausting drudgery of a long hearing might have

been avoided. As it is, we have to consider here a record of 2,242 pages, and briefs of well over 1,000 pages.

The issue before us as we see it is a narrow one, and might perhaps be disposed of in a more or less summary manner. And yet it may be conducive to a proper understanding of it if we give some of the background of this controversy.

As stated in the bill, Railroad Co. in February, 1912, leased its property to Cumberland for ninety-nine years. Cumberland agreed to pay as rental a sum sufficient to pay the interest on certain bonds of Railroad Co. and dividends at the rate of 5% on its capital stock, also $500 per annum to be used for the expense of maintaining the organization of Railroad Co. It is not necessary to consider whether there was any obligation enforcible against the lessee to pay the dividends at the rate of 5% direct to the stockholders of Railroad Co.; for such dividends were in fact paid. In the view which we take of the case, it makes no difference whether they were channeled through Railroad Co. or paid directly to the stockholders. We have here the mere shell of Railroad Co. left with the operation of its properties entirely in the hands of the lessee.

Railroad Co., as was the case in the country generally with street railroads, did not prosper. It was forced to seek rate increases and numerous other forms of relief. It finally failed to earn even its operating expense to say nothing of a sum sufficient to enable the lessee to pay the rental without reaching into its own pocket. One line after another was abandoned and the lessee took on itself the job of disposing of abandoned plant and equipment. In 1927 an amendment of the charter was obtained authorizing Railroad Co. to operate buses. P. & S. Laws, 1927, Chap. 47. Of course there is nothing to the suggestion of plaintiffs' counsel that such legislation is invalid and subject to collateral attack because of the failure to have stockholders' approval of the request for such extension of charter

powers. R. S., 1944, Chap. 49, Secs. 1, 2; *Greaves* v. *Houlton Water Co.*, 143 Me. 208; 59 A. (2nd) 217, 220. Substitution of bus service was gradually made in places where trolleys were not operating at a profit. By 1941 trolley service had been abandoned and bus service substituted. The new bus service was financed through the sale of abandoned railroad property in so far as the funds would go; the balance was furnished by the lessee or its assignee. The fact of the matter was that Railroad Co. as a separate operating entity was in an impossible situation. It was insolvent, and except in so far as the lessee or its assignee stood back of it, it would have ceased to operate. Under the terms of the Public Utility Holding Company Act of 1935, it appeared to the officials of Central Maine that the continuance of the lease of the street railroad, which had turned out to be so unprofitable for Central Maine, was inconsistent with the provisions of the Public Utility Holding Company Act and that the Securities and Exchange Commission could and probably would order a reorganization of the holding company system headed by the New England Public Service Company of which both Central Maine and Railroad Co. were parts. In fact while this reorganization was under way there had been conferences between representatives of Central Maine and the Securities and Exchange Commission as to the necessity of Central Maine divesting itself of its control of Railroad Co. These discussions finally culminated in the filing of a voluntary plan by Central Maine in accordance with the provisions of Section 11 (e) of the Public Utility Holding Company Act. The main purpose of this plan which was dated November 7, 1944 was to set forth a method for Central Maine to divest itself of its control of Railroad Co.

Before this plan could become effective, approval of it by the Securities and Exchange Commission was required. The implication of the bill of complaint is that this plan was a self-serving device on the part of Central Maine, not in the public interest, unfair to the stockholders of Rail-

road Co., and filed as a means to permit Central Maine to evade its obligation under the lease. There is not a shred of evidence to support these charges which are obviously based on the assumption that the Securities and Exchange Commission in approving the plan was either hoodwinked or joined with Central Maine in collusive action for the sole benefit of the stockholders of Central Maine. The Commission found that "Central Maine's interest in the transportation business is not retainable under the standards of Section 11 (b) (1)," of the Public Utility Holding Company Act and that the plan set forth a proper method by which Central Maine could comply with the provisions of the federal statute. Is it possible that a procedure required by federal law could be a badge of fraud as claimed in the plaintiffs' bill? It is true that the plan would operate to the financial advantage of Central Maine as claimed in the bill. But is that a reason why it should be condemned? Was the federal statute enacted solely as a means to harass public utilities? May it not have had a constructive purpose? And when the Securities and Exchange Commission has found that a certain plan is "fair and equitable" and "necessary" to effectuate the provisions of a federal law, how far can this court be expected to go in holding otherwise? These are all questions which are implicit in the bill of complaint now before this court.

At the time the plan was filed Central Maine was the owner of approximately 36% of the bonds and debentures of Railroad Co. and 49% of its capital stock. The essential features of the plan were that Railroad Co. would release Central Maine and Cumberland from all their liabilities under the lease; that Central Maine would procure a purchaser for all the assets of Railroad Co.; that Central Maine would purchase for $134,364 certain real estate and physical assets of Railroad Co.; that Central Maine would pay to Railroad Co. a sum which with other moneys on hand of Railroad Co. would be sufficient to pay off the bonds held by third parties and to distribute to stockholders of Railroad

Co. other than Central Maine an amount equal to $110 per share for their stock; and that Railroad Co. would take all necessary action to effectuate this result. Central Maine was also to hold harmless the stockholders of Railroad Co. against all liabilities and to pay counsel fees. This plan of course envisaged not only the termination of the lease but the dissolution of Railroad Co.

The Securities and Exchange Commission in accordance with its custom sent a notice of the filing of the plan and of a hearing thereon on December 7, 1944 to certain representatives of security holders of Railroad Co. to the Public Utilities Commission of Maine, and among other requirements ordered Central Maine to give notice to all stockholders of Railroad Co. This notice included a summary of the plan and there was sent with it a so-called report by the Commission to security holders prepared in accordance with the provisions of Section 11 (g) of the Public Utility Holding Company Act. This report is really an explanation of the plan prepared to assist the individual stockholders "in determining whether or not to vote in favor of the proposed plan to terminate the lease of Portland's transportation system to Central Maine Power Company (Central Maine), to sell the transportation system and to dissolve Portland." The report then calls attention to the fact that the plan has been found by the Commission to be necessary to effectuate the provisions of 11 (b) (c) of the Public Utility Holding Company Act. In the report attention is also called to the fact that "the security holders of Portland have the right under Maine laws to have their stock appraised and receive an amount for their stock based on such appraisal." Then follows this statement by the Commission: "Although this Commission has found the plan fair and equitable, whether or not any security holders should vote in favor of the plan or choose to exercise his rights under the appraisal statute or by other means should be determined by his individual judgment."

After the hearing set for December 7, 1944, the Commission on December 19th filed its order which was preceded by Findings and an Opinion approving the plan. The Findings and Opinion are voluminous. The undisputed facts found by the Commission indicate a very shaky financial condition of Railroad Co. with bankruptcy inevitable unless Central Maine should continue to back it financially. Under the circumstances and in view of certain ambiguities in the lease with respect to the liability of Central Maine, the Commission pointed out that it has found that the plan is a fair and equitable settlement for all parties concerned and that the plan is "necessary" within the meaning of the statute to effectuate the provisions of 11 (b) of the federal statute. The Commission found that the real value of the stock of Railroad Co. lay in the guarantee by Central Maine of a rental which would permit the payment of dividends of $5.00 per share for 66 more years. It is also evident that the Commission considered the possibility that Railroad Co. might have other claims against Central Maine, but that none the less the price of $110 per share was fair to the stockholders of Railroad Co. and also to the security holders of Central Maine. The Commission directed that the plan be submitted to the stockholders of Railroad Co. for their approval or disapproval. It is then pointed out that the Skowhegan Savings Bank and certain other banks, holders of 1170 shares of the capital stock of Railroad Co., have stated that they regarded the price of $110 a share as inadequate. The Commission then makes the following statement and, in the view which we take of this case, it is the crux of the problem before us:

"In addition it may be noted that any stockholders dissenting from the proposed plan will have a right, pursuant to Maine statute, to have their stock appraised."

The stockholders' meeting proposed by the Securities and Exchange Commission was held December 28, 1944. There were represented at the meeting 14,485 shares out of a

total of 19,990. Thirteen thousand seven hundred and thirty-five shares, of which 9,795 were owned by Central Maine, voted in favor of the plan. Seven hundred and fifty shares, of which 730 were owned by the plaintiffs and intervenors, voted in the negative.

This was the situation when the Bill in Equity was filed in February, 1945. It is important to note that the three original plaintiffs here had the right to appear at the hearing before the SEC and that they exercised that right. They had a right to a review in the proper United States Circuit Court of Appeals of the order of the SEC approving the plan. U. S. Code, Tit. 15, 79x. They did not exercise that right. Nor did they avail themselves of the remedy provided by state law to have their stock appraised. R. S., 1944, Chap. 49, Secs. 81, et seq. What these stockholders apparently want as we gather it from their bill is not reimbursement, not to be made whole under any of the provisions of law either state or federal, but rather by appealing to the broad equity powers of the state court to assume control over these corporations, and particularly to enforce the provisions of the lease of Railroad Co. exactly in accordance with its terms. They take pains to disclaim any purpose to avail themselves of their statutory rights.

The sitting justice gave to the claims of the plaintiffs the most painstaking consideration. They were granted wide latitude in developing their theories of fraud and oppression, and in his findings as amended covering ninety-three pages he disposed of their various contentions both specifically and in general terms. He found that the defendant power companies had not used the control which they possessed over Railroad Co. for oppressive purposes; that there was a perfectly honest purpose in changing from a railroad system to a bus system; that Cumberland and Central Maine in their merger had complied with all provisions of law; that the decree of the Public Utilities Commission in approving the assignment of the lease was valid; that it

was not fraudulent to propose a termination of the lease by mutual consent; that stockholders were not barred from voting on this question even though they might be stockholders in both companies; that Central Maine in proposing the plan acted legally; that it was not necessary to have a unanimous vote of stockholders to terminate the lease; that the termination of the power contract with Railroad Co. was proper; that full publicity of the plan was given to the stockholders of Railroad Co.; that counsel for Central Maine had been advised by the SEC that the plan was necessary to comply with the law; that the special stockholders' meeting of Railroad Co. held December 28, 1944 was a legal meeting and the action there taken in approving the plan was legal action. Then as applying to all the specific and general charges of fraud the sitting justice made this finding: "Actual fraud directly or indirectly chargeable to any defendant made a party to this cause is not proven." With all of these findings and rulings whether of fact or of law this court concurs.

It is not necessary at this point to attempt to define and limit the scope of the authority of the state court; but for the purposes of this case we shall assume that the sitting justice did have jurisdiction to determine the issue of fraud raised by the bill as well as other issues above set forth, including the legality of the stockholders' meeting. We call attention to this here because we are forced to hold as more fully explained later that the relief sought by this bill is beyond the power of the state court to grant in view of the jurisdiction given to the SEC under the Public Utility Holding Company Act of 1935.

The charges of fraud are without substance. Mistakes may have been made by the lessee or its assignee in the method of handling the leased property but they were honest mistakes and there is no evidence that in a single instance the lessee or its assignee received any improper financial gain. What was done, and it is particularly evident

in the shift from trolley cars to busses, was in an effort to keep the transportation system in the Portland area functioning as a going concern. As the plaintiffs attempt to develop their charges of fraud, they appear to rest on nothing more substantial than a failure of the lessee to maintain the property of Railroad Co. as a street railroad. True it is that they charge a misuse of the money received from the sale of abandoned equipment, but the money was used almost entirely in the purchase of new equipment, mostly busses. As we have already pointed out, and we will discuss it further later, the proposed plan by which Central Maine divested itself of control of Railroad Co. is not a mark of fraud. The action of Central Maine was fully justified in order to comply with the provisions of federal law. If fraud was as obvious as the plaintiffs claim, why was nothing said about it to the Securities and Exchange Commission at the hearing on December 7, 1944? It was certainly pertinent to the issue which the Commission was then considering. And these same banks which are now plaintiffs were represented at that hearing by Theron A. Woodsum, a statistician and security analyst employed by the Savings Bank Association of Maine. He said not one word about fraud. Not only have the plaintiffs failed to offer any direct evidence of the fraud which they have charged, but their silence when they should have spoken casts grave doubt on whether they ever had such evidence. To be sure, the briefs of counsel are filled as is the bill of complaint with charges of fraud. These are iterated and reiterated. But the vehemence with which an allegation is asserted is not a substitute for proof of it.

Though the sitting justice denied the main contentions of the plaintiffs, he did sustain the bill against Central Maine and Railroad Co. He computed the present worth of the stock of Railroad Co. at $119.25 per share and saw no reason for reducing this to $110.00, the figure found as fair and equitable by the Securities and Exchange Commission. He unquestionably recognized that the authority of the SEC

was exclusive in so far as the SEC chose to exercise its authority; but he construed the opinion and findings of the Commission as leaving open to the minority stockholders the right to apply to the state court in equity for such relief as they might have had had the matter never been submitted to the Securities and Exchange Commission.

The final decree was filed February 16, 1948. It sustained the bill against Railroad Co. and Central Maine and dismissed it as to the other defendants. Under its terms Railroad Co. and/or Central Maine were ordered within fifteen days after the effective date of the decree to deposit with the Clerk of Courts $119.25 for each share of stock held by the plaintiffs and intervenors, the Clerk of Courts to hold said moneys for distribution among the plaintiffs and intervenors on surrender of their certificates of stock. The two defendants were also ordered to pay $5,000 to the plaintiffs and intervenors as counsel fees together with a single bill of costs. The case is before us on the plaintiffs' appeal from this decree. It may be noted that during the protracted hearings numerous appeals were taken from interlocutory orders and decrees, also from the findings as filed by the sitting justice. In so far as these are properly before us and have any relevancy, we shall regard them as merged in the appeal from the final decree. We agree with the contention of counsel for the plaintiffs, concurred in by defendants' counsel, that all issues raised by the record are open for consideration and determination anew by this court. Such is the effect of R. S., 1944, Chap. 95, Sec. 21, which provides in part that in an appeal from a final decree in equity the law court shall "affirm, reverse, or modify the decree of the court below, or remand the cause for further proceedings, as it deems proper." See *Pride* v. *Pride Lumber Co.*, 109 Me. 452, 457; *Trask* v. *Chase*, 107 Me. 137, 150. Such being the case, we are not limited to a consideration of errors in the decree claimed by the parties filing the appeal but may consider issues raised by any party.

The plaintiffs requested in accordance with R. S., 1930, Chap. 91, Sec. 58, now R. S., 1944, Chap. 95, Sec. 26, separate findings of law and of fact. The requests for findings of law were 128 in number and cover 38 pages of the record; the requests for separate findings of fact are 58 in number and cover 39 pages of the record. The findings of the sitting justice as amended cover 93 pages of the record and discuss all relevant issues of law and of fact as we see them. In spite of this most conscientious effort to observe the provisions of the statute and the wishes of counsel, there was subsequently filed a motion that the sitting justice give specific findings to each separate request; a motion that there be entered a special finding of the material facts on which the sitting justice finally fixed the value of the stock at $119.25 per share; a motion for certain additional rulings of law. These last requested rulings are 37 in number and cover 42 pages of the record. In so far as there were specific rulings on these various motions, they were denied. And properly so. None the less it is insisted in the argument before this court that the failure of the court below to accede to the insistence of plaintiffs' counsel was error. In the posture in which this case is presented to us, that question is academic. For we have the entire record before us and are considering the issue anew. *Trask* v. *Chase, supra,* 150; R. S., 1944, Chap. 95, Sec. 21. In case, however, that there should be any doubt about the duty of the sitting justice, we will say that he fully performed his duty. The case of *Sacre* v. *Sacre,* 143 Me. 80; 55 A. (2nd) 592, settles this question. The court which hears an equity action is not obliged to answer each and every request of counsel for a ruling whether it be of law or fact. The language of the *Sacre* case applies here: "Where a court dictates into the record in such intelligible manner or form as to render them distinguishable, what the material facts are as he views them, and what are his conclusions of law in reference thereto, he has substantially complied with the statute and given the party his substantial rights under the

same." The plaintiffs have no just cause of complaint on this point.

Did the court below have jursidiction to decide the issue which the plaintiffs seek to raise?

By the terms of the Public Utility Holding Company Act of 1935, U. S. C. A. Tit. 15, Sec. 79k, the Securities and Exchange Commission was given wide powers to reorganize public utility holding companies throughout the country. These powers, assumed and exercised by the federal government, are derived from the commerce clause of the constitution and, in so far as necessary to carry out the policy of the statute, are exclusive. In other words, the states are barred, either by legislation or by court action from interfering in any way with the overriding federal authority. *Otis & Co.* v. *Securities and Exchange Commission,* 323 U. S. 624; 89 L. Ed. 511; *Okin* v. *Securities and Exchange Commission,* 161 F. (2nd) 978; *Public Service Commission* v. *Securities and Exchange Commission,* 166 F. (2nd) 784. *In re Electric Bond & Share Co.,* 65 N. Y. S. (2nd) 23. Like other administrative agencies, such as the Interstate Commerce Commission, the Federal Trade Commission and the National Labor Relations Board, the SEC is in its control of public utilities dealing with the very special problems which are really beyond the competence of courts to handle. For a discussion of this general subject by Learned Hand, C. J., see *Herzfeld* v. *Federal Trade Commission,* 140 F. (2nd) 207, 209. Not only that, but there is an obvious danger in permitting two tribunals to deal with the same subject-matter, particularly where discretion plays so important a part in the determination of the issues involved. *Public Service Commission* v. *Securities and Exchange Commission, supra; In re Standard Power & Light Co.,* 48 F. Supp. 716. In the second of these two cases, the opinion of the court clearly points out this danger, page 720:

"The liquidation of such companies creates special problems growing out of prolix intercorporate

relations. Security holders are frequently scattered all over the country. The Commission is charged, as an administrative agency, with the duty and responsibility of investigating whether any proposed liquidation is fair and equitable to creditors and stockholders. The essential purposes of the Act will be aborted if any stockholder may substitute at random some other procedure for the machinery provided by Congress. While apposite machinery is available in the state court of chancery in Delaware to liquidate Standard Power, the utilization of such machinery would, it seems to me, invite confusion in administration, and delays would occur as a result of a state and federal jural dichotomy, followed by a lack of economies. The Commission has not sought the aid of the state tribunal, and, as we are dealing with an instrumentality of interstate commerce in a field in which Congress has spoken, state laws must yield to paramount federal authority;

\* \* \* \* \* \* \*

"I conclude that this court should not allow the public duties of the Commission under the Act to be thwarted, or the safeguards of the Act to be circumvented. I find it was the intention of Congress that the Commission should have complete custody of any public utility holding company affected by the Act, with a right to enlist the aid of any court, state or federal, at its option, to enforce its orders. Hence, the Commission's order of June 19, 1942, directing Standard Power to present its plan of liquidation to the Commission was, in truth, an order to liquidate under Commission supervision and in no other manner."

There can be no question of the right of Congress under the commerce clause of the constitution to bar any action by the state inconsistent with the full and plenary exercise of the authority given to the federal government in a particular field. This is made clear in the case of *Schwabacher* v. *United States, supra.* Both the majority and minority opinions agree that Congress has such power. In matters

within its scope, a federal law is supreme. *Harvey* v. *Rackliffe,* 141 Me. 169; 41 A. (2nd) 455; 161 A. L. R. 296.

It was the avowed purpose of the Public Utility Holding Company Act to compel the simplification of the structures of holding company systems throughout the United States. To effectuate this purpose, the SEC was given wide powers which it could exercise in carrying out the policy of the Act without regard to the wishes of stockholders and in spite of charter provisions. The so-called death sentence clause meant that the Commission could compel the dissolution of a company whenever necessary to carry out the congressional mandate, and could take complete control of all of its assets. The important restriction on the authority of the Commission, whether the procedure is under Sec. 11 (b) (2), in opposition to the wishes of the company involved, or under Sec. 11 (e) to carry out a plan submitted by the company itself, is that the plan shall be "fair and equitable" to all concerned. How wide is the power of the Commission can be seen by a study of the cases which have arisen under the Act.

In *Otis & Co.* v. *Securities and Exchange Commission, supra,* the jurisdiction of the SEC over the dissolution of a holding company under Sec. 11 (b) (2) of the statute was upheld, and the court laid down the doctrine that priority given to preferred stockholders by the corporate charter could be disregarded. The case assumes that this is true whether the proceeding is under Sec. 11 (b) (2) or under Sec. 11 (e).

The court said, page 636 U. S. and 89 L. Ed. 521:
"The applicability of the charter provision under the Public Utility Holding Company Act of 1935 is a matter of Federal law."

And further, at page 638 U. S. and 89 L. Ed. 522, we find the following:

"The Commission in its enforcement of the policies of the Act should not be hampered in its de-

termination of the proper type of holding company structure by considerations of avoidance of harsh effects on various stock interests which might result from enforcement of charter provisions of doubtful applicability to the procedures undertaken. Where preexisting contract provisions exist which produce results at variance with a legislative policy which was not foreseeable at the time the contract was made, they cannot be permitted to operate."

In *American Power and Light Co.* v. *Securities and Exchange Commission,* 329 U. S. 90; 91 L. Ed. 103, the construction of the statute as laid down in the preceding case was again adopted and the power of the Commission to order reorganization or dissolution or any other appropriate remedy was upheld.

In *Schwabacher* v. *United States, supra,* the Supreme Court in construing a federal statute of similar purposes, held that "liquidation preferences provided by the charter do not apply."

*Phillips* v. *Securities and Exchange Commission,* 153 F. (2nd) 27, holds that the federal statute is "a specific overriding federal law" which takes precedence over the requirements of state statutes with respect to the reorganization or dissolution of a state chartered corporation. Hence a reorganization or dissolution under the federal statute could be carried through without stockholders' approval, which would be required under state law.

See also on this same point *Okin* v. *Securities and Exchange Commission, supra; Application of Securities and Exchange Commission,* 50 F. Supp. 965; *In re Electric Bond & Share Co., supra.*

In *Public Service Commission* v. *Securities and Exchange Commission, supra,* a voluntary plan was submitted under Sec. 11 (e) of the federal statute. The court in discussing

the intent of Congress to bar the states from any interference with the powers granted to the SEC said, at page 787:

> "Section 11 starts with imposing upon the SEC the 'duty' of ascertaining how far holding companies can be 'simplified' and the 'voting power fairly and equitably distributed'; and sec. 11 (b) vests it with power to accomplish these ends. Section 11 (e) makes it possible for the Company to forestall action by the Commission by taking the initiative; subject to such regulations as the Commission may promulgate, it may 'submit a plan * * * for the purpose of enabling' it 'to comply with the provisions of subsection (b).' Such a submission is a substitute for the performance of the Commission's 'duty'; it is another way of realizing purposes recited in the preamble—sec. 1, 15 U. S. C. A. sec. 79a. Whether the Commission or the company begins is only a matter of procedure; the outcome will be precisely the same, for in either case the end sought is measured by subsection (b), an end whose realization the Act affirmatively prescribes. This once understood, it becomes to the highest degree unlikely that Congress should have set up a system of dual control over the fulfillment of this purpose; for it is scarcely necessary to expatiate upon the obvious defect of so organizing any official control; we have already declared ourselves on the matter in Phillips v. Securities and Exchange Commission."

Action in a state court inconsistent with the power of the Securities and Exchange Commission will be enjoined. *In re Standard Power & Light Co., supra; Okin* v. *Securities and Exchange Commission, supra; In re United Gas Corporation,* 162 F. (2nd) 409.

The Securities and Exchange Commission in a simplification proceeding which it finds is fair and equitable, and necessary to comply with the provisions of the federal statute, has the power to modify the rights granted to stockholders by the corporate charter or otherwise. That is implicit in the opinions of the Supreme Court sustaining the Commis-

sion's authority to order a corporation dissolved. As has already been pointed out, it is apparent in the rulings in a number of cases where the right of the Commission has been sustained to modify or terminate preferences granted to preferred stockholders, and the Commission may, regardless of contract rights, change the form of the security back of debentures and provide for their payment without regard to the premiums provided for in the indenture. *In re Community Gas & Power Co.*, 71 F. Supp. 171; *In re Engineers Public Service Company*, 71 F. Supp. 797; *Massachusetts Mutual Life Insurance Company* v. *Securities and Exchange Commission*, 151 F. (2nd) 424; *In re North Continent Utilities Corporation*, 54 F. Supp. 527; *In re American Gas & Power Company*, 55 F. Supp. 756. The basis of the Commission's power in these respects is summed up in *Massachusetts Mutual Life Insurance Company, supra*, as follows: "For when the provisions of a contract are contrary to a new concept of public policy not foreseeable when the contract was made it becomes illegal and can not be enforced."

The plaintiffs' charges of fraud, as we have pointed out, are based on the fact that Central Maine has not complied with the provisions of the lease and has sought to terminate it. The non-compliance has been due not to a failure to meet the financial obligations which were imposed on the lessee but to a disposition of the assets of Railroad Co. in a manner inconsistent with the maintenance of the property of the lessor as a street railroad. There can be no question that the termination of the lease and the dissolution of Railroad Co. were required by an overriding federal statute which made unenforcible many of the provisions of the lease. Central Maine acted in conformity with the orders of the Securities and Exchange Commission. Such complaints as the plaintiffs had should have been addressed to the Commission, not to Central Maine which was complying with the Commission's orders. The Commission took extraordinary care to see that the stockholders of Railroad Co. were in-

formed as to all contemplated action and that the rights of dissenters were protected. Under the doctrine of *Phillips* v. *Securities and Exchange Commission, supra,* the Commission could have proceeded by compulsory process without stockholder approval to compel the dissolution of Railroad Co. and could have reached just the same result as was arrived at here. It chose to permit Central Maine to file a voluntary plan and to require assent to it at a stockholders' meeting. Such assent was forthcoming. The validity of the corporate action taken at such meeting is now attacked on two grounds, firstly, that action to terminate the lease could only be by unanimous vote, and secondly, that action taken at that meeting was oppressive and void as to the dissenting stockholders. The sitting justice has found that the action taken at the meeting was legal and that there was no oppression practiced on the minority. A careful reading of the record satisfies this court that such rulings were in all respects correct. The mere fact that Central Maine held enough stock to control that meeting does not render the action taken at it illegal. It had the right to acquire the stock of other companies and as an incident of the ownership of such stock had the right to vote it. See the Legislative Acts covering its charter powers. P. & S. Laws, 1905, Chap. 129; 1909, Chap. 298; 1913, Chap. 184. Moreover, to uphold plaintiffs' contention that unanimous consent of stockholders was necessary to terminate the lease would permit a small minority of stockholders of a public utility to circumvent the provisions of a federal statute which Congress has declared the public interest requires.

We think that the jurisdiction of the SEC in this case to approve the plan and to determine the amount which should be paid to all stockholders was exclusive. It really cannot perform its duties on any other theory. The Commission did approve the plan as fair and equitable. That is, the price was a fair price for the stockholders of Railroad Co. to receive and it was a fair price for Central Maine to pay. And we must remember that the SEC had jurisdiction of

both of these companies and that both were involved in this simplification proceeding. If the state court determines that Central Maine must pay more, it is certainly taking action inconsistent with that taken by the Commission which has found a less price to be a fair one for Central Maine. When the Commission assumed jurisdiction, the power of the state court to take any incompatible action was gone.

The wide and exclusive powers possessed by the Securities and Exchange Commission are evident by a glance at a very recent case, *In re North American Light & Power Co.*, 170 F. (2nd) 924 (C. C. A. 3rd Cir. November 5, 1948). Involved here was an approval by the SEC of a plan submitted under Sec. 11 (e). Certain stockholders claimed that the Commission erred in holding the plan fair and equitable. The court held that the Commission could suggest amendments to the plan which would cure the defects which the Commission found, and then could approve it so long as the plan as modified would come within the statutory requirement of being fair and equitable. It was likewise held to be within the authority of the Commission in determining the rights of all common stockholders and the extent to which they would share in corporate assets to approve the settlement of certain corporate claims without the necessity of considering the merits of each individual claim. It was only required to use its reasonable judgment broadly to determine the expediency of the entire settlement. The opinion also determines that there is no necessity even in the case of a voluntary plan under 11 (e) for the Commission to require stockholder approval.

Let us apply these principles to the case before us. In so far as stockholder approval goes, we have it here and it was given at a legal meeting. Though it may not have been necessary, it did no harm. It seems also to be implied, if not expressly asserted in the *North American* case, that the Commission which had the power to authorize the settle-

ment of claims for or against the corporation must also have the power to determine the value of the stock which is affected by those settlements and that its rights in this respect are exclusive. In other words, the Commission's power in the instant case to determine the value of each and every share of the stock of Railroad Co. was exclusive. Two independent tribunals cannot readily function in this field without great confusion. It is obvious that the sitting justice fully recognized this handicap. Why, then, did he consider this bill? His reason is made perfectly clear in his findings. He assumed that the Securities and Exchange Commission had specifically reserved to minority stockholders such rights as they might have had in the state court and that the Commission had the authority to make such delegation of its powers. We have already suggested that such supposed reservation was the crux of this case. How far did the Commission intend to go, how far did it go, and how far did it have the power to go in remitting minority stockholders to their remedies in the state court?

We have some question whether the Commission really intended to remit the dissenters to any and all remedies which they might have had in the courts of this state. What happened was this: The report which the Commission ordered sent to shareholders prior to the hearing on December 7, 1944 contained a statement already referred to which read as follows: "Although this Commission has found the plan fair and equitable, whether or not any security holder should vote in favor of the plan or choose to exercise his rights under the appraisal statute or by other means should be determined by his independent judgment." This report sent under the provisions of Section 11 (g) of the statute was not an order of the Commission nor even a part of the findings of the Commission on which its order was ultimately based. The learned justice below took the words "or by other means" to reserve to dissenting stockholders any rights which they might have had to bring an action in the state court. We doubt if such was the intent of the

SEC; for in the findings and opinion which are the basis for its order we find only this as to the rights of dissenting stockholders: "In addition it may be noted that any stockholders dissenting from the proposed plan will have a right, pursuant to Maine statute, to have their stock appraised." Counsel for the defendants claim that the right to an appraisal under the Maine statute was the only right which the Commission intended to reserve to dissenters. It is not, however, necessary to decide this question; for in view of the case of *Schwabacher* v. *United States*, heretofore referred to, we think it was beyond the power of the SEC to delegate to the state court any of its authority which, if exercised, might be inconsistent with action which might be taken by the Commission in approving the plan which had been submitted in accordance with the federal statute. We feel that this restriction certainly applies to the reservation of a right to pursue any and all remedies in the state court and probably applies to a reservation of the right to seek the remedy provided by the statutes of Maine for an appraisal. In the light of the *Schwabacher* case we must hold that it was beyond the power of the state court to grant the relief which it did in this case. It could enter no decree which would be inconsistent with such action as was taken or might be taken by the Commission in the exercise of the exclusive jurisdiction given to it by the Holding Company Act.

The *Schwabacher* case originated in the District Court E. D. Virginia, 72 F. Supp. 560, out of a merger of the Pere Marquette Railroad Co. into the Chesapeake & Ohio Railway Co. The Pere Marquette was incorporated under the laws of Michigan, the Chesapeake & Ohio under the laws of Virginia. The merger was a voluntary one requiring a finding by the Interstate Commerce Commission that it would be "consistent with the public interest," that it would be "just and reasonable," and thirdly the assent was necessary of a "majority, unless a different vote is required under applicable state law, in which case the number so required shall

assent, of the votes of the holders of the shares entitled to vote." Interstate Commerce Act, Sec. 5, (49 U. S. C. A. Sec. 5, 10 FCA, title 49, Sec. 5). It is easy to discern here a striking similarity in the procedure for approving by the I. C. C. of this merger under the Interstate Commerce Act and the provisions in the Public Utility Holding Company Act for approval by the SEC of a voluntary plan for simplification under Section 11 (e). The Supreme Court in its opinion in the *Schwabacher* case treats the plan for the merger on the assumption that it called for a liquidation of the Pere Marquette. This would mean that under Michigan law full payment in cash or its equivalent to dissenting stockholders "for both the par value of their preferred shares and accrued unpaid dividends thereon" would be required. The Supreme Court in its opinion refers to the two statutes as "of very similar purposes." It is true that the Transportation Act describes the jurisdiction of the I. C. C. as "exclusive and plenary" and that these words do not appear in the Holding Company Act with reference to the jurisdiction of the SEC. But this is not a matter of importance if it is apparent from the underlying purposes of both statutes that it was the intent that jurisdiction of the respective commissions within a certain ambit should be exclusive. And as the cases already cited establish, such intent is found in the Holding Company Act. The *Schwabacher* case was heard in the first instance by a three judge court in accordance with the provisions of the Transportation Act. The plaintiffs were preferred stockholders who sought to enjoin an order of the I. C. C. approving the merger. What they really wanted was not, however, to set aside the merger but to compel the Commission to modify its order to grant to the plaintiffs the preferential treatment to which they claimed they would be entitled under Michigan law. The court declined to do this and dismissed the action. It took this action not only because it felt that to give the dissenting stockholders a preference over those who approved the plan had "no support in practical eco-

nomics or in commercial ethics," but primarily because the order of the I. C. C. had left the two railroads "free to settle controversies with dissenting stockholders through negotiation and litigation in the courts." The case came before the Supreme Court on an appeal from this decision, which by a 5-3 opinion reversed the lower court.

The reversal of the Supreme Court was on the ground that the Interstate Commerce Commission had exclusive jurisdiction to determine the question of the validity of the merger which it had found just and reasonable. The court said, page 968 of 68 S. Ct., page 1317 of 92 L. Ed.: "We therefore hold that no rights alleged to have been granted to dissenting stockholders by state law provision concerning liquidation survive the merger agreement approved by the requisite number of stockholders and approved by the Commission as just and reasonable." The case was remanded to the Commission for a reconsideration of its findings in the light of this opinion of the Supreme Court holding that state law governing the rights of the dissenting stockholders had been supplanted by the federal statute. A glance at the opinion will show the striking analogy between that case and the one before us. In so far as the authority of the I. C. C. went, its duties in approving a railroad merger are almost identical with those of the SEC in approving a simplification plan. The I. C. C. must find a voluntary carrier-initiated plan "consistent with public interest," "just and reasonable" and assented to by a majority of the stockholders. The SEC must find a voluntary plan initiated under Section 11 (e) "necessary" to comply with the provisions of the statute, and "fair and equitable to the persons affected." The I. C. C. did approve the plan reserving to dissenting stockholders their rights under Michigan law; and as found by the sitting justice in the instant case the SEC did approve the plan submitted by Central Maine reserving to dissenting stockholders their rights under Maine law. If the jurisdiction of the I. C. C. was exclusive and it was under a duty to settle the rights of all stockholders, the

same is unquestionably true with respect to the SEC whose powers over the dissolution of public utility holding companies are broader than the powers of the I. C. C. over railroads.

Some extracts from the opinion in the *Schwabacher* case may be helpful. At page 966 of 68 S. Ct. and 92 L. Ed. 1315, we find the following:

> "It appears to us inconsistent with the Interstate Commerce Act for the Commission to leave claims growing out of the capital structure of one of the constituent companies to be added to the obligations of the surviving carrier, contingent upon the decision of some other tribunal or agreement of the parties themselves. We think that the Commission must pass upon and approve all capital liabilities which the merged company will assume or discharge as a result of merger. If some greater amount than that specified in the agreement is to be allowed to any class of stockholders, it must either deplete the cash or inflate the liabilities or capital issues of the new company."

And again at page 1315 L. Ed.:

> "We think the Commission was in error in assuming that it did not have, or was at liberty to renounce or delegate, power finally to settle the amount of capital liabilities of the new company and the proportion or amount thereof which each class of stockholders should receive on account of its contributions to the new entity."

And again, at page 1316 L. Ed.:

> "The Commission likely would not and probably could not be given plenary and exclusive jurisdiction to interpret and apply any state's law. Whatever rights the appellants ask the Commission to assure must be founded on federal, not on state, law.

> "Apart from meeting the test of the public interest, the merger terms, as to stockholders, must be found to be just and reasonable. These terms

would be largely meaningless to the stockholders if their interests were ultimately to be settled by reference to provisions of corporate charters and of state laws. Such charters and laws usually have been drawn on assumptions that time and experience have unsettled. Public regulation is not obliged and we cannot lightly assume it is intended to restore values, even if promised by charter terms, if they have already been lost through the operation of economic forces. Cf. Market Street R. Co. v. Commission, 324 US 548, 89 L. ed. 1171, 65 S. Ct. 770. In appraising a stockholder's position in a merger as to justice and reasonableness, it is not the promise that a charter made to him but the current worth of that promise that governs, it is not what he once put into a constituent company but what value he is contributing to the merger that is to be made good."

And we find the following at page 1317 L. Ed.:

"We therefore hold that no rights alleged to have been granted to dissenting stockholders by state law provision concerning liquidation survive the merger agreement approved by the requisite number of stockholders and approved by the Commission as just and reasonable. Any such rights are, as a matter of federal law, accorded recognition in the obligation of the Commission not to approve any plan which is not just and reasonable."

The sitting justice assumed jurisdiction in this case in reliance on the law as it had been declared by the only federal tribunals which up to that time had had this specific question before them, namely, the Interstate Commerce Commission, the Securities and Exchange Commission, and the United States District Court for the Eastern Division of Virginia. He could hardly have done otherwise. He assumed as did those tribunals that the particular federal agency involved had the right to remit to the state court the determination of the issue of the rights of minority stockholders. When, however, the Supreme Court of the United States tells us in the *Schwabacher* case that a state

court is without jurisdiction to take action when a federal tribunal of exclusive jurisdiction has the subject-matter before it, and that state law governing the rights of stockholders has been supplanted, we must accept that ruling as binding on us.

The case should be remanded to the sitting justice for the entry of a decree dismissing the bill.

*Case remanded for the entry of a decree dismissing the bill.*